United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Marla Dixon and Earl Reese-<br>Thornton, Sr., individually and as<br>parents and natural guardians of<br>Earl Reese-Thornton, Jr., Plaintiffs<br><br>v.<br><br>United States of America,<br>Defendant. | )<br>)<br>)<br>)<br>) Civil Action No. 15-23502-Civ-Scola<br>)<br>)<br>)<br>)<br>) |

## Amended Verdict and Order Following Non-Jury Trial

The Plaintiffs bring this action under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671, *et seq.*, and Florida law, alleging that doctors at a federally supported health center committed medical malpractice during the birth of Marla Dixon's and Earl Reese-Thornton, Sr.'s son, Earl Jr. The Amended Complaint (ECF No. 34) alleges that, on December 2, 2013, Plaintiff Marla Dixon went into labor and was admitted to North Shore Medical Center ("North Shore"). Dr. Ata Atogho, an employee of the Jesse Trice Community Health Center ("Jessie Trice"), was the delivering doctor. Dixon's pregnancy had not been diagnosed as high risk. However, during labor the baby's heart rate decelerated. The United States alleges that Dr. Atogho advised Dixon to undergo a caesarean section ("C-section"), but Dixon refused. The Plaintiffs allege that Dixon requested a C-section several times, and that Dr. Atogho refused, telling her to "keep pushing." Dixon ultimately delivered Earl Jr. vaginally after Dr. Atogho used a "Kiwi" vacuum three times during the delivery. The vaginal delivery caused Earl Jr. to have irreversible brain damage.

Count One of the Complaint asserts an FTCA claim against the United States for the medical negligence of Dr. Atogho. Count Two asserts an FTCA claim against the United States for the vicarious liability of Jessie Trice for Dr. Atogho's negligence. Plaintiffs seek the following damages for Earl Jr.: past and future pain and suffering; loss of capacity for the enjoyment of life; permanent and total disability; loss of capacity to earn money or be gainfully employed in the future; past and future disfigurement and scarring; past and future mental anguish; past economic damages, including medical expenses; future medical expenses; and supportive, palliative, rehabilitative, nursing care and treatment for the rest of his life. Plaintiffs Dixon and Thornton, Sr. seek past and future non-economic damages, including but not limited to, mental pain and suffering; and past and future loss of filial consortium.

Both parties filed motions for summary judgment. The Court granted summary judgment on the limited factual issue that the vaginal birth of Earl Jr. led to his injuries, but did not grant summary judgment with respect to the issue of legal causation. (Order on Cross Mtns. for Summ. J., ECF No. 110.) The Court also granted summary judgment on the factual issue that Dixon was a Medicaid recipient at the time of Earl Jr.'s birth. (*Id.*) The issues remaining to be determined are: (1) the standard of care that Dr. Atogho owed to the Plaintiffs; (2) whether Dr. Atogho breached the applicable standard of care; (3) if Dr. Atogho breached the standard of care, whether the breach proximately caused Earl Jr.'s injuries; (4) whether any party or non-party caused or contributed to Earl Jr.'s injuries; (5) the amount of damages, if any, due Plaintiffs; and (6) whether any damages should be reduced, limited, or set-off pursuant to Florida Statute Sections 766.118 and 768.

On March 9, 10, 14 and 20, 2017, the Court held a non-jury trial. Prior to the trial, the parties submitted their pretrial stipulations (ECF Nos. 106, 107), as well as their proposed findings of fact and conclusions of law (ECF Nos. 112, 114.) The Court has carefully reviewed these submissions. After considering the credible testimony and evidence, and the applicable law, the Court finds that Dr. Atogho breached the standard of care by not offering a C-section to Dixon and such breach caused the injuries to Earl Jr. As a result, the Court finds in favor of the Plaintiffs on Counts One and Two of the Complaint. **The Court awards the Plaintiffs a total of $33,813,495.91.**

## 1. Summary of the Testimony

### Irene Dixon (by videotaped deposition taken May 25, 2016)

After obtaining consent from the parties during the Calendar Call on February 28, 2017, the Court watched the videotaped deposition of Irene Dixon in chambers on March 2, 2017.

Irene is 57 years old and has resided in Jacksonville, Florida for the past 47 years. She has never been to Miami. She is the mother of Marla Dixon, having adopted her at the age of eight. Irene has been diagnosed with memory problems and is taking Aricept.

Marla has two brothers: Derrick Dixon and Darrell Dixon. Marla lived with Irene until Marla graduated from high school. After she graduated from high school, Marla moved to Miami. Once Marla was in Miami, Irene had contact with her two years later when Marla called to say she was pregnant and on the way to the hospital to have a boy and everything was fine. After the

baby was born, Marla called again and said she had a boy named Earl. A day or two after the birth, Marla called again to say the doctor and nurse told her the baby had brain damage. Approximately two weeks after the birth, she learned about a law suit. In December 2013, Irene's son Darrel Dixon lived with her.

Irene saw the baby when he was brought to a hospital in Jacksonville by Marla. She visited the baby in the hospital. Marla has three children: Earl Jr., Serinity, and a third child whose name she cannot pronounce. Irene speaks to Marla by phone every couple of weeks. Irene has a good relationship with Earl Reese-Thornton, Sr. but does not see or speak to him very often.

### Dr. Richard S. Boyer (by deposition transcript)

With the parties' agreement, the Court reviewed the deposition testimony of Dr. Boyer taken on September 21, 2016.

Dr. Boyer is licensed to practice medicine in Utah. He received his M.D. at the University of Utah and is board-certified by the American Board of Radiology and Diagnostic Radiology. He holds certificates of added qualification in neuroradiology and pediatric radiology and currently limits his practice to pediatric radiology. Dr. Boyer has given over a hundred depositions and has consulted for cases in Florida but has never testified in Florida.

Dr. Boyer disagrees with two findings or observations reflected in Dr. Sze's report. They both agree that Earl Jr. suffered a hypoxic ischemic injury but Dr. Sze described the pattern of injury as a mixed type "with elements of both the acute profound pattern and the partial prolonged pattern." Dr. Boyer does not use the term "partial prolonged." Dr. Boyer refers to this as a total cortical pattern and in parentheses, near total brain pattern. The distinction between the two doctors is more in the nomenclature.

There are a couple of issues of timing where Dr. Boyer does not completely agree with Dr. Sze. Under the heading "Timing of Injury," subheading "Ultrasound," Dr. Sze wrote, "Abnormalities are generally detected after approximately 24 hours and demonstrated better in the subsequent 24 hours." Dr. Boyer believes we can see abnormalities on ultrasound earlier than 24 hours and he uses the window of 12 to 24 hours for when abnormalities may be seen on ultrasound after a hypoxic ischemic brain injury. Dr. Boyer has reviewed hundreds of ultrasounds of neonates within the first 24 to 48 hours.

Dr. Sze also writes that he would have thought that Earl Jr.'s ventricles would have opened by 24 hours, and the fact that they did not means that there may have been cerebral edema from injury and that it generally takes two days for that to happen. So, Dr. Sze is pushing the time when the injury

occurred prior to labor and Dr. Boyer disagrees with that. Dr. Boyer believes that the literature establishes that it takes two to three days for this phenomenon of reopening to occur; it's a normal phenomenon for the small ventricles to open up after the baby is born. Dr. Boyer believes the ventricles follow that pattern so he disagrees with Dr. Sze. Dr. Boyer believes there are objective criteria upon which to base the timing of the injury based upon the openness of the ventricles in a neonate. Marvin Nelson wrote a paper in Pediatric Radiology in 2003 and there was a supportive paper in 2010.

During the birthing process, as the baby is head-down in the womb and the uterus contracts, it squeezes the baby's head and it tends to squeeze fluid out of the ventricles, which are fluid spaces inside the brain and squeezes out fluid spaces around the brain. As the baby goes through the birth canal, that process occurs, and so it is like wringing out a sponge, and it's a normal phenomenon. From Dr. Nelson's paper, when they looked at over 100 ultrasounds in the first 24 hours of life, about 80 percent of babies had small ventricles. It's over the next 2 to 3 days that the ventricles will open up to normal size so the fluid re-accumulates in the brain and around the ventricles, and that's a normal phenomenon.

That may or may not be affected by an ischemic event. Many hypoxic ischemic injuries to the brain are very discrete in terms of the parts of the brain that are injured and it's not a sufficient enough portion of the brain to affect the ventricular size. So, some people make the mistake in trying to make that jump. You have to know what parts of the brain were affected and how much.

In some cases of hypoxic ischemic injury, less commonly in neonates and more commonly in older children and adults, there's a fairly predictable curve or process of swelling of the brain which begins to be recognizable between about 24 and 48 hours. It lasts for a maximum of between 48 and 72 hours and then wanes and gets back to its normal size by the end of five to seven days. That is the classic edema course.

Babies don't usually follow that for a couple of reasons. First, there is the superimposed reopening phenomenon. Second, babies have more fluid in and around their brains than older children and adults do. Third, is that babies have open sutures, which are quite pliable. Sutures are the joints between the calvarial plates, and that is what allows a baby to get through the birth canal without shattering its skull. A baby's head is much more pliable than an older child or adult's head, and they accommodate for swelling that way. That classic edema curve typically does not occur; it is unusual to see it in a neonate. Even a few months later that classic curve may occur, but not in a neonate.

Hypothetically, there might be some cases in which the time that it takes for the ventricles to reopen would provide some indication as to the timing of the hypoxic ischemic injury.

Dr. Boyer agrees with Dr. Sze that the imaging demonstrates abnormalities of hypoxic ischemic injury and they both saw the same injury. Dr. Boyer also agrees with Dr. Sze that the hypoxic ischemic event occurred at or near the time of labor and delivery. However, Dr. Boyer disagrees with Dr. Sze's opinion that the ventricles are slightly discrepant.

Dr. Boyer states that Dr. Sze's opinion is misleading because it is based upon two different events having occurred. Dr. Boyer believes there were not two events but a continuum or progression of things going from bad to worse and that caused these kinds of injuries to the brain.

There is a timeline for the manifestations of the injury and Dr. Boyer gave some parameters for that timeline. Looking at the injury to the deep grey matter structures, what Dr. Sze calls the profound pattern, if that were the only injury we know it takes a minimum of 10 to 12 minutes in fetal lambs and primates and maybe a little longer, perhaps up to 15 minutes, in humans to begin seeing that pattern of injury. The deep grey matter manifestations would take humans approximately 15 minutes of oxygen deprivation to begin to manifest.

In those animals, if you have completely cut off the blood supply to the brain and don't restore it for 30 minutes or so the animal cannot be resuscitated and will not survive. That is the shortest window. So we know there was deprivation of blood flow to the brain for at least 10 to 15 minutes.

We also know from clinical experience that if there is a less complete interruption of blood flow, that different parts of the brain are damaged and that is what Dr. Sze called partial prolonged and, because it's a cumulative process of energy deletion, it's not a complete interruption of blood flow, it will take longer. Based on Dr. Boyer's experience and the literature, he opines that it takes a minimum of 30 to 60 minutes for that to occur. So, it is possible that part of the brain injury could have occurred over a period of an hour or more, possibly even a few hours, but it doesn't require a lot of hours for that to occur. Everything we see here could have happened in the last hour leading up to birth and we always have to include the resuscitation until we restore circulation to the brain and oxygen and glucose delivery.

Other experts who look at fetal heart tracings and so forth can tell us when this baby was in trouble. As long as it is in the imaging window, all of the injury to this child likely occurred within 60, or at the most 90, minutes before he was born or until he was adequately resuscitated.

If an MRI were used, you would see the evidence of the hypoxic ischemic injury within minutes to an hour but we don't have that luxury in this case. With an ultrasound, we can start to see those changes within 12 to 24 hours depending on how extensive the injury is. In this case, a lot of the brain was damaged and that's why we see the deep grey matter manifestations on the second ultrasound taken approximately 24 hours after the birth. The first ultrasound, taken five hours after the birth, was normal. Dr. Boyer opines that the event which caused the damage occurred sometime between 7 to 19 hours before the birth.

It is possible, but unlikely, that the manifestation on the deep grey matter is a result of two different insults. The following are causes of oxygen deprivation resulting in the deep grey matter manifestation: placental abruption, a complete knot in the cord, maternal cardiac arrest and amniotic fluid embolization. But none of those are cited in the record here. So, the most plausible cause here is that it was the process of laboring and the contraction of the uterus and the bradycardia that the baby was suffering in response to that. The baby's heart was perfusing the baby's brain and so every time the heart slows, there was less perfusion and if the oxygen level was dropping at the same time, then perfusion that was getting there was less helpful to the brain. Every cell of the brain is a little factory that needs oxygen and glucose to survive and, like a fighter in the ring, every time you get knocked down, they get up more slowly until they can't.

The best explanation of what happened was progressive energy depletion in the parts of the brain that are most energy-dependent and as that progressed, those parts of the brain were recruited and suffered and eventually died. Dr. Boyer's specialty is not the specific causes at issue; he simply looked at the result of what happened.

By correlating the clinical observations, Dr. Boyer was able to be more precise in his opinion as to the timing. The first ultrasound was normal after 5 hours of age. By 12 or at most 24 hours, it was going to be abnormal after insult. So, the injury would have occurred 7 to 19 hours before the birth, based only on the ultrasound results. With clinical observations from the time of birth, the baby had low Apgar scores, acidosis, cyanotic, depressed, floppy and apneic. That tells Dr. Boyer the child was in acute distress at the time he was born which was when he was most at risk. The minutes immediately after the birth until the child was resuscitated are the most likely causes of this child's brain injury. The child was dying at the time of birth and it takes time to reverse the process: restore circulation to get the heart pumping with adequate frequency to push the blood and oxygenate the brain. Even at 10 minutes the

Apgar on the child was still a 6. Dr. Boyer does not have a standard of care opinion on how his resuscitation was managed.

Dr. Boyer concluded the child's cortex and subcortical white matter is virtually gone and permanent meaning the child will not have higher functions, i.e. speech, language, motor control and activity, vision, hearing, memory, judgment, intelligence, personality, etc. When there is a reduction in perfusion to the brain, the brain redirects blood flow to the deep grey matter structures, the brainstem, cerebellum because those are critical for life support functions but it does so at the expense of the more peripheral parts of the brain.

There are two possibilities for how this injury occurred: the first is that this all happened very acutely and there was virtually no blood flow, which damaged the deep parts of the brain and then spread peripherally and damaged some of the outside of the brain. However, the imaging does not support that quite as much because the part of the brain that is more damaged is the more peripheral part with some preservation of the deep parts, which suggests it happened differently. If there was some blood flow getting through, the brain would have redirected that centrally to preserve those structures. It looks like the child was able to do that at the expense of the outer part of the brain, the cortex, because the cortex is what is most damaged here.

The Miami Children's Hospital report lists a subgaleal hemorrhage resolved December 3, 2013. The ganglia is a tough fibrous band that is underneath the scalp and it is loosely applied in babies and quite vascular and it is not uncommon to bleed under the galea. So there is some hemorrhage that is outside the skull under the scalp.

The brain MRI report on December 6, 2013 shows moderate subgaleal fluid, scalp edema and no cephalohematoma. This tells us there was a mechanical stress to the baby's head in getting born. It's more common if you apply vacuum extraction and even more common if you use forceps.

Dr. Boyer's readings of the film are consistent with other experts' opinions that the assault began at about 14:00 on December 2, 2013 and continued until 5 minutes after delivery. The child was born at 15:21 so there is a window of approximately 90 minutes and Dr. Boyer's findings are consistent with that.

### Dr. Gordon Sze (by deposition transcript)

With the parties' agreement, the Court reviewed the deposition testimony of Dr. Sze taken on September 23, 2016.

Dr. Sze currently works at Yale University and is board-certified in radiology and has a certificate of added qualification in neuroradiology. Dr. Sze earns $200 - $250,000 per year doing medicolegal work. Dr. Sze was retained

by the United States for his expertise in neuroradiology. Dr. Sze created a report dated August 17, 2016 after reviewing the medical records, ultrasounds and films of the child, as well as Marla Dixon's records and films. Dr. Sze also reviewed the report of Dr. Boyer.

Dr. Sze's ultimate opinion is that within a reasonable degree of medical certainty, the imaging examinations of the child demonstrate abnormalities of hypoxic ischemic injury of the mixed pattern with elements of both the acute profound pattern and the partial prolonged pattern. Hypoxia occurs when there is not enough oxygen and ischemia occurs when there is not enough blood flow. Hypoxic ischemic injury basically boils down to the brain not getting enough oxygenated blood. That could be due either to the child not getting enough blood flow or to the blood flowing fine but not having enough oxygen in it. From a radiological point of view, it cannot be determined from looking at films whether an injury resulted from hypoxia or ischemia.

Partial prolonged type injury is where the fetal brain gets some oxygenated blood but not quite enough. This usually takes half an hour to an hour or more to occur. With this type of injury the peripheral portions of the brain tend to be affected, especially the watershed regions.

Acute profound type injury is where the baby has a catastrophic lack of oxygenated blood reaching the brain and, because it's catastrophic, it really takes a very short amount of time to cause the damage, and the length of time that this occurs cannot be very prolonged or the fetus will die. It is said that 15 to 20 minutes is a good time period but the outer margin may be 10 to 30 minutes. This type of injury tends to affect the central portions of the brain, especially the basal ganglia and thalami.

It is possible for the fetus or infant to have a partial prolonged type injury and then have a catastrophic problem at the end. There are multiple variations of these types of injuries. One variation could be if you don't have quite enough oxygen going for a long period of time, you will eventually get all the areas of the brain involved, including the central portions which are generally spared as the brain attempts to shunt blood towards the center. However, if it goes long enough, you could certainly get the entire brain involved. A second variation could be to sustain a partial prolonged injury earlier on and then have the situation resolve to some extent and then have a catastrophe at the end. There are multiple possibilities.

Dr. Sze does not know what happened in this child's case. Dr. Sze opines that the abnormalities disclosed on the imaging examinations are generally consistent with a hypoxic ischemic event having occurred at or near the time of labor and delivery, although some evidence is slightly discrepant.

Based upon the initial ultrasound and going back 24 to 48 hours, that equates to 19 to 43 hours prior to birth, approximately. Since the first ultrasound showed a normal brain, and it often takes 24 hours or more to see something on the ultrasound, then you go back 24 hours from December 2, 2013 and end up on the evening of December 1, 2013. Ultrasound is not a good tool for looking for hypoxic ischemic injury.

The second ultrasound taken approximately 24 hours after birth shows an abnormal brain so this is consistent with an injury occurring near 15:00 the day before. Dr. Sze agrees that the window when the injury occurred was from the evening of November 30 through the delivery at 15:21 on December 2, 2013. Dr. Sze did not do any type of clinical correlation to determine when the injury occurred within that window. However, Dr. Sze agrees with Dr. Atogho that if he had performed a C-section on Marla Dixon at or before 14:15 on December 2, 2013, more likely than not Earl Jr.'s brain injury could have been prevented.

Dr. Sze reviewed the ultrasound taken on December 5, 2013. The only thing useful in that ultrasound is looking at the mass effect. The ventricles are larger than in the December 3, 2013 ultrasound. Since mass effect is maximal at three days and as the ultrasound showed maximal mass effect as of December 3, 2013, if you count back three days, it brings you to November 30, 2013. A normal baby's ventricles expand in a day or two, roughly. In this case, Dr. Sze cannot say if the ventricles were small because of mass effect or normal delivery.

Dr. Sze also reviewed the MRI scan of December 6, 2013. The MRI shows restricted diffusion which occurs in cases of, among other things, hypoxic ischemic injury. The restricted diffusion here is in the entire brain above the tentorium. This MRI is consistent with his opinion that the hypoxic injury window was from November 30, 2013 through delivery on December 2, 2013 at 15:21. The MRI shows significant, permanent, irreversible brain damage. Most of the supratentorial brain is damaged. A child with this type of damage would experience cerebral palsy that is significant and developmental delay that is significant, among other things. Dr. Sze also reviewed CT's from November 2015 and a December 2016 MRI. Basically, the majority of the brain is destroyed except for the internal part of the brain that keeps people breathing and allows them to swallow.

In a neonate, increased mass effect and swelling can be seen after approximately one day following a hypoxic ischemic injury. If the hypoxic ischemic injury had occurred at labor and delivery, one would expect the greatest mass effect as shown by compression of the ventricle to be seen on the December 5, 2013 ultrasound or the December 6, 2013 MRI. Since this is not

the case, one could hypothesize that the maximum edema is present on the ultrasound of December 3, 2013. This would correlate with a hypoxic ischemic event on November 30, 2013 or December 1, 2013. However, this is the only evidence that suggests a hypoxic ischemic injury that definitely predates labor and delivery while all the other evidence supports an event that included labor and delivery. Furthermore, some of the evidence excludes an event significantly prior to labor and delivery – things like the ultrasound being negative initially. If labor began on the morning of December 2, 2013, that is the more accurate window of the hypoxic injury (from time of labor through delivery).

There are cephalohematomas outside the brain which are consistent with a Kiwi suction device. But that injury, or the blood loss associated with it, would not have caused brain injury.

Dr. Sze agrees with Dr. Boyer as far as the images and doesn't really disagree as far as other conclusions. If experts for the plaintiff opine that the hypoxic injury occurred between 14:00 and 15:21 on the day of birth, that time period would fall within Dr. Sze's window. If the lack of blood started at 14:00 and continued through delivery and even several minutes after delivery, that would be consistent with Dr. Sze's opinion on the window of when the injury occurred. Dr. Sze believes the injuries to the child were caused from a combination of a partial prolonged and acute profound injury.

### Dr. Ata Atogho

Dr. Atogho is from Cameroon and came to Washington in 1995. He graduated from Howard University and Howard University Medical School. Dr. Atogho now works for Metro-Miami Obstetrics and Gynecology ("OB/GYN"). He is board certified in obstetrics and gynecology. After his residency, he came to Miami and worked for Tenet Health. After a couple of years, Tenet decided to close its facilities. Dr. Shiner recommended he work for Jessie Trice, a facility that serves underserved and undocumented populations. He signed his first contract with Jessie Trice in 2012, which called for him to deliver babies. Currently, he is an associate professor at Florida International University, Ross University and the American University of the Caribbean.

Jessie Trice had three facilities but only two were very productive. Dr. Atogho had no responsibility to see patients at Jessie Trice's clinic; patients at the clinic were attended to by mid-wives and nursing assistants. His responsibility for patients began when they were ready to deliver and went to the hospital. At that time, Dr. Atogho would be notified. Every time a patient was brought to or came to the hospital, Dr. Atogho would be notified and would go to the hospital. Some days, he would deliver 3 or 4 babies and some days none. Prior to Marla Dixon's delivery, he had delivered approximately 2,000

babies. Dr. Atogho is familiar with the standards of the American College of Obstetrics and Gynecology (ACOG).

Dr. Atogho worked at his office two days per week from 9:00 a.m. to 5:00 p.m. seeing patients. His office was 10 minutes away from North Shore. His home was in Miami Lakes and was 15 to 20 minutes away from North Shore. Dr. Atogho had privileges at North Shore beginning in 2008 and was delivering his own patients there. When Dr. Atogho began working at North Shore, he received and reviewed the North Shore policies and procedures. He no longer delivers babies at North Shore; now, he delivers at Jackson North and Memorial in Miramar.

Dr. Atogho was the on-call physician at Jessie Trice for Marla Dixon on December 2, 2013. At 2:45 he began treating Dixon. He does not recall seeing her on previous occasions. Dr. Atogho is aware Dixon signed a consent form for possible surgical delivery.

At 04:07, Dr. Atogho did a telephone order for Pitocin which increases contractions. Uterine contractions can restrict the flow of blood to the fetus. Dr. Atogho ordered a low dosage that was to be administered if Dixon's contractions slowed down. The order required nurse Yolande Ashman McCray to stop Pitocin if there was evidence of fetal distress. At 13:33 nurse McCray stopped Pitocin due to deceleration of the heartbeat. The fetal heart strip indicated fetal distress.

The first time Dr. Atogho was at Dixon's bedside was sometime after noon on December 2, 2013, but before 13:49. There was another patient about whom Dr. Atogho was called, and he usually sees all of his patients when he comes to the hospital. However, during his deposition in April 2016, Dr. Atogho said he had no recollection of being at Dixon's bedside before 13:49. Today, he has a better recollection of when he arrived at Dixon's bedside because he reviewed Sara Fuentes's records, which indicated that he was called to the hospital to see Fuentes at 12:10. Since he was in the hospital to see Fuentes, his normal practice would be to see all of his patients when he arrived. Therefore, he believes that he must have seen Dixon.

Dr. Atogho received a call at 13:33 to come to Dixon's room. If he was already in the hospital, he could have arrived in the room well before 13:49. Dr. Atogho ordered restarting of Pitocin. According to the chart, Pitocin was restarted at 13:50. It is unlikely that within one minute of his arrival Pitocin would have been restarted, which is why Dr. Atogho believes he was at Dixon's bedside before 13:49.

Upon arrival at Dixon's bedside, Dr. Atogho was the captain of the ship. He was at Dixon's bedside at 13:49. The mother was complete and ready to be delivered at 13:33. Dr. Atogho claims that he probably advised Dixon before

13:49 that she needed to have C-section. However, in his deposition he testified that he was at Dixon's bedside at 13:49 and advised her to have a C-section. He further testified that he had no recollection of having that conversation earlier, and that there would have been no reason to have that conversation earlier.

The child had a category 3 fetal heart rate from 13:25 to 13:49. A category 3 fetal heart rate means the heart rate has poor variability and deceleration. A category 3 fetal heart rate is abnormal, indicates fetal distress, indicates that the baby is not getting enough blood and oxygen, and places the baby at risk for brain damage or death. The cause of the fetal distress could have been the Pitocin, dehydration or the fact that the baby was taking too long to be delivered.

Dr. Atogho did not document the fact that the baby had a category 3 heart rate at 13:49. From 13:49 to 15:21 he did not document that the baby had any complications, but he does not document every action he takes during a delivery. He did not advise nurse McCray that the baby was in distress, nor did he tell her Dixon had refused a C-section. From 13:49 to 15:20 he was also following Fuentes's delivery. He never called for backup to care for Fuentes in spite of the fact that Dixon's fetus exhibited a category 3 heart rate.

After determining the fetal heart rate was category 3 at 13:49 and prior to using the Kiwi for the first time at 14:00, Dr. Atogho administered Pitocin. It is not uncommon that when the physician comes in, the Pitocin is restarted by the nurse without the doctor saying anything. However, it is usually restarted at half the rate at which it was stopped. Dr. Atogho does not recall at what rate Pitocin was restarted in this case. It is not uncommon to start and stop the Pitocin thereafter but Dr. Atogho can't say if it was stopped and started in this case.

Dr. Atogho claims he told Dixon sometime between 13:33 and 14:00 that she needed to have a C-section or her baby would suffer brain damage or die. He does not recall everything that was said but the gist of it was that she did not want a C-section, she wanted a vaginal delivery. Dr. Atogho acknowledged that it is possible he did not ask Dixon why she did not want a C-section. Dr. Atogho claims Dixon refused the C-section on multiple occasions between 13:49 and 15:21. He did not ask any other staff members to explain the need for a C-section to her.

It's a huge deal when a mother refuses a C-section when the baby has a category 3 heart rate. It's important to find out the reason why the mother is refusing but more important from the mother's perspective, not his. Dr. Atogho is familiar with the publications of ACOG including practice bulletins and committee opinions. According to ACOG 664, when a pregnant patient refuses

a recommended medical treatment, the physician should carefully document the refusal in a medical record. Dr. Atogho acknowledged that it is important for the physician to document a mother's refusal of a C-section, but in this case it was not documented because he was too busy providing care to Dixon. The documentation can be done at another time.

The only place in the entire medical chart setting forth Dixon's refusal of a C-section is one note in the progress notes, which states, "Declined c/s." This note was created maybe one to two hours after the birth. There is no note concerning Dr. Atogho offering Dixon a C-section. In hindsight, Dr. Atogho admits that he should have written two to three pages about his conversation with Dixon and her boyfriend about the C-section. Dr. Atogho admits that he probably didn't put enough information or that he needed more "beef" to the statement in the medical chart that Dixon declined the C-section.

Dixon's refusal to have a C-section could have adversely affected the child's health. The North Shore Chain of Command Policy requires the attending physician to consult with the nurse in charge concerning any issue which could adversely affect a patient's health. According to Dr. Atogho, McCray was there at all times and would have heard Dixon's refusal to have a C-section. The North Shore policy requires an attending physician to notify the department director and chief nursing officer concerning any issue that could adversely affect a patient's health. Dr. Atogho did not notify either of those individuals and admits this failure may have violated the policy of North Shore.

Dr. Atogho did not order any type of preparations for a C-section in the event Dixon changed her mind, but that is not usually what is done.

From 13:27 the heart rate was tachycardic – above 160. A common side effect of Pitocin is a category 2 or 3 heart tracing. According to ACOG, Pitocin should be reduced or stopped if there is a category 2 or 3 tracing. Dr. Atogho does not believe he violated this recommendation. When he came into the room, the nurse had stopped the Pitocin, had started oxygen, had given IV fluids and had moved the patient around, all of which were appropriate. But, once the mother refused a C-section, the baby had to be delivered. Therefore, the only alternative was to give the uterus a little help to expel the baby.

The label for Pitocin states "discontinue the infusion of Pitocin immediately in the event of … fetal distress." Dr. Atogho agrees that a category 3 heart rate indicates fetal distress. However, another part of the label allows doctors to use Pitocin in their discretion after weighing the potential benefits against the possible harm.

Dr. Atogho does not recall stopping the Pitocin but it is possible it was stopped at some point. Usually it is turned on and off several times during labor. There is no documentation that Pitocin was stopped after 15:00.

Dixon was in an emergent condition and needed a C-section from 13:49 to 15:21. Dr. Atogho disputes the documentation that he used the Kiwi from 14:00 to 14:05 because he does not usually use the Kiwi for that long. The Kiwi can be used when the baby is at zero or plus 1 stations. He has previously testified in a deposition in another case that the Kiwi can only be used at plus 2 station, at least. Once the Kiwi was unsuccessful three times, a C-section should have been conducted. But it was not done in this case because the patient refused the C-section.

He agrees the baby was in category 3 fetal heart condition from 14:00 to 15:21. Between 14:05 and 14:45 Dixon had oxygen and IV fluids going. From 13:49 to the delivery, Dr. Atogho never documented that the baby was in any sort of trouble. On that day, Dr. Atogho knew that there was some probability, but he can't say if it was high or low, that the baby would have a problem. However, in his deposition he testified that there was a high probability there would be a problem.

Dr. Atogho went back and forth between Fuentes's room and Dixon's room. Dr. Atogho was on his phone with his stockbroker for 8 minutes. He could have used that time to further document his conversation with Dixon concerning her refusal to have a C-section. Dr. Atogho does not believe his phone call to his financial advisor from 14:25 to 14:32 would have interfered with his ability to treat either Fuentes or Dixon.

The Fuentes baby was delivered at 15:08 and the placenta was delivered at 15:10. Dr. Atogho left Dixon to attend to Fuentes. It typically takes 10 to 15 minutes after the delivery to clean up. If the placenta was delivered at 15:10 and he had a baby next door in distress, he would not have cleaned up the baby and could have returned to Dixon by 15:11. At 16:00, Dr. Atogho returned to Fuentes to do a repair after Dixon's baby was delivered.

Dr. Atogho received $350.00 for each baby delivered, but if he had called for a backup doctor to deliver Fuentes's baby, he would not have received the $350.00 for the Fuentes delivery.

Dr. Atogho believes that there was a woman in her mid-50's in the room with Dixon. Dr. Atogho believes she was Dixon's mother. Dr. Atogho believes the woman told Dixon several times to have the C-section. It was a tense situation. Her boyfriend was telling her the same thing. Dixon was cussing them out.

When the baby was delivered at 15:21 the baby had a low Apgar score. The neonatal intensive care unit was called but Dr. Atogho did not make the call. It is up to the nurse to call. Usually when the Kiwi is used, the neonatal intensive care unit is called.

Dr. Atogho did not tell the NICU personnel that Dixon had refused a C-section. There would have been no need to tell them since that would not affect their treatment of the baby. Dr. Atogho's discharge sheet does not contain any notes that Dixon refused a C-section.

Dr. Atogho cannot specifically recall the nurse leaving the room but in 90 minutes he believes she must have left the room.

Dr. Atogho is aware that there is a refusal of medical treatment form to be filled out whenever a patient refuses a C-section but that form was not used in this case. Later that day, near midnight, he performed a C-section on another patient. There is no reason, other than the patient's refusal, that he would not have performed a C-section on Dixon.

The manifested pain to the mother at the time of crowning is significant and can last anywhere from 20 seconds to a minute. The tendency is to either give up and not push so that you don't feel the pain, or push through the pain to get it over with. It is common for women to say something like "just cut me." He does not recall Dixon saying that but it is possible she could have said that.

Once the baby's head is crowning, you cannot do the C-section anymore. You would be putting the mother's life at risk since you would have to push the baby back inside the womb. In this case, sometime around 14:30 it would have been too late to do the C-section. In his deposition, he testified that the C-section was on the table up until the time of the delivery.

**Yolande McCray**

McCray is a nurse/manager at Memorial Regional. She previously worked as a staff nurse at North Shore until December 2016. She has been a nurse since 2005. Since 2008, she has assisted in the delivery of an average of 3 babies per day.

On December 2, 2013, she was the labor and delivery nurse assisting Dr. Atogho with Marla Dixon's delivery. Prior to testifying, she reviewed Dixon's records and has a recollection of the events. From 07:00 until the delivery of the child at 15:21, she was the nurse in charge of the Dixon case. Pitocin was started at 09:46 at the low end dosage of 2. The level of Pitocin was gradually increased to 10 by 11:26, when she called Dr. Atogho. It remained at 10 until the Pitocin was turned off at 13:30 because the baby had a deceleration of the heart rate.

She notified Dr. Atogho at 13:33 of the deceleration of the heart rate. Dixon was "complete" at 13:33 and McCray would not have left the room from that time until the delivery of the child. Dixon pushed for approximately 90 minutes. There are many things that can skew the baby's heart rate while

the mother is pushing. The heart rate remained in the 150 to 190 range with a baseline of 170.

The chart indicates that Dr. Atogho was at Dixon's bedside at 13:49. That was the first time he was at Dixon's bedside. Had he been there earlier, she would have noted that.

Pitocin was restarted at 13:50. Although it is not documented, McCray believes she would have restarted the Pitocin at level 10. The Pitocin would have continued until the baby was delivered. After the baby is delivered the Pitocin is continued wide open until the uterus returns to the normal position.

Because the patient was complete, McCray would not have left the room between the doctor's arrival and the delivery. At no time while McCray was attending Dixon did Dr. Atogho offer Dixon a C-section. Dixon said, "just cut me. I want to be cut. I can't do this anymore." The father of the child was present in the room but no other persons were present.

If Dixon had refused a C-section, McCray would have documented the refusal by using a Refusal of Treatment form. No such form was used in this case because nothing was ever offered that Dixon refused. McCray would have also faxed the Refusal of Treatment form to the risk manager.

McCray saw the doctor's progress notes indicating, "refused c/s." McCray asked Atogho why he wrote that when they really didn't offer her a C-section and he said, "it's the first baby and it was right there." McCray knows that note is a lie. In January 2014, she met with representatives of Tenet Health and told them that Dixon did not refuse a C-section. This was prior to the commencement of any litigation.

McCray believes the hospital has a rule that the Kiwi cannot be applied more than three times. The Kiwi was applied at 14:00 and popped off at 14:05. When the mother has a contraction and pushes, the doctor pulls on the Kiwi to assist in the delivery. McCray did not find it unusual for Dr. Atogho to leave the room after the Kiwi popped off. The patient was not actively delivering. Dr. Atogho would return to the room when the baby was coming out.

The second Kiwi was applied at 14:45 and the third Kiwi was applied at 14:50. McCray assisted Dr. Atogho on approximately 10 other deliveries and he used the Kiwi 4 to 5 times. Not all of those occasions were emergency situations.

The nurse is responsible for charting the events during the course of the delivery, and the doctor is responsible for charting the outcome of the delivery and if there were any interventions.

Although NICU is supposed to be called when a Kiwi is applied, they are not called until the birth is imminent so they are not just hanging around and not being used.

## Earl Reese-Thornton, Sr.

Reese-Thornton, Sr. grew up in Miami and graduated high school in Miami. He played football in high school. He attended Fortis Technical School, but did not finish his studies there. He later received an HVAC certificate and worked in that field for a while. He later worked at Marshalls and now works at CNS wholesale groceries. Reese-Thornton, Sr. now lives alone in North Miami. He does not have any hobbies because he has to be on call for his son.

Reese-Thornton, Sr. met Marla Dixon on MySpace and later met her in person and dated her. They dated for a year and a half before Earl Jr. was born. Dixon lived on campus at Job Corps where she was trying to get a medical administrator nursing degree. At one point they started living together while she was working at Job Corps and he was working at Marshalls. They lived together for 4 months before Dixon got pregnant. It was a planned pregnancy and he was excited she was pregnant.

Reese-Thornton, Sr. went to the doctors' appointments with Dixon during her pregnancy. None of the doctors said there was a problem with the pregnancy. Dixon was skeptical about being a parent and did research to learn more about pregnancy and births. They watched videos of vaginal and C-section births.

On December 2, 2013 at 1:00 or 1:10, Dixon woke Reese-Thornton, Sr. up and said her water had broken. Reese-Thornton, Sr. got dressed quickly and they left about 10 minutes later. They arrived at the hospital 10 to 15 minutes after that, at approximately 1:30. Reese-Thornton, Sr. drove his car to the hospital with Dixon and his mom. His mom came with them so she could take Reese-Thornton, Sr.'s car to take Reese-Thornton, Sr.'s sister to work. His mom did not go into the hospital.

When they arrived at the hospital and told them Dixon was in labor, they were sent to the delivery room area. Dixon was admitted and Reese-Thornton, Sr. stayed with her for a while. They put a fetal monitor strip on Dixon and gave her an IV. Reese-Thornton, Sr. stayed with Dixon for an hour or two and then decided to go home and get some rest until it was closer to the delivery of the baby. Reese-Thornton, Sr. doesn't do too well at hospitals, and he and Dixon had previously agreed that he would drop her off at the hospital and come back when the baby was ready to be delivered.

Reese-Thornton, Sr. returned to the hospital a little before 1:30 p.m. and went straight to Dixon's room. Two student nurses and a head nurse were present. The doctor was not present. The head nurse never left the room from the time Reese-Thornton, Sr. arrived until after the delivery.

Dr. Atogho came to the room about 10 to 15 minutes after Reese-Thornton, Sr. arrived. Dixon said "cut me" to Dr. Atogho. Dr. Atogho did not

say anything and placed the suction machine on the baby's head. The suction cup popped off three times while Reese-Thornton, Sr. was there. Dixon was pushing and screaming "cut me, cut me." Reese-Thornton, Sr. was encouraging Dixon to push.

Reese-Thornton, Sr. never heard Dr. Atogho offer Dixon a C-section. Dr. Atogho never said the baby was in danger. Dr. Atogho never said the baby would be born with brain damage or death without a C-section.

After the suction cup came off the first time, the doctor left the room for 35 to 40 minutes. When Dr. Atogho returned to the room, he tried the suction cup again. Dr. Atogho never told Thornton a C-section was necessary or the baby would suffer brain damage or death. In fact, Dr. Atogho never said there was any problem with Earl Jr.

After the suction cup came off the second time, Dr. Atogho put it back on. Dixon again asked the doctor to "cut her." Dr. Atogho told her to keep pushing. Dr. Atogho left the room and came back 10 to 15 minutes later. Once again, Dr. Atogho never told Reese-Thornton, Sr. a C-section was necessary or the baby would suffer brain damage or death. In fact, Dr. Atogho never said there was any problem with Earl Jr.

Dr. Atogho used the suction cup a third time without success. Dixon said "cut me" and said her back hurt and she felt a burning. Dr. Atogho told her to keep pushing. Dr. Atogho left a third time and Dixon kept pushing and the baby was delivered when the doctor was not in the room. The nurse caught the baby. Dr. Atogho returned to the room 5 minutes later and cut the umbilical cord. The baby came out facing down, he was blue, his tongue was sticking out and Thornton saw a lot of feces on him. The baby had swelling on the left side of his brain. A group of people came into the room and tried to revive the baby and were successful. They were in the room 10 – 15 minutes.

After the baby was born, Reese-Thornton, Sr. asked Dr. Atogho if they were going to reshape the baby's head. Reese-Thornton, Sr. could not hear his response because there was too much noise. When the baby was in NICU, Reese-Thornton, Sr. asked Dr. Atogho if the baby was going to be alright and he said, "yeah."

The next day, December 3, 2013, the baby was taken to Miami Children's Hospital. Reese-Thornton, Sr. rode in the ambulance with the baby. Reese-Thornton, Sr. never told any doctor at Miami Children's Hospital that Dixon had refused a C-section. Reese-Thornton, Sr. never told Dr. Jayakar or any other doctors that Dixon had refused a C-section.

The baby was at Miami-Children's for a month. Reese-Thornton, Sr. learned from doctors at Miami Children's that the baby had severe brain damage due to lack of oxygen to the brain at birth. Dixon was released from

North Shore after 3 days. When Earl Jr. was released from the hospital they all stayed at Reese-Thornton, Sr.'s mom's house. The baby had seizures, was always crying and was in pain. Thornton felt sad because all his plans for his child would not work out: fishing, bicycle riding, double dates.

Reese-Thornton, Sr. had to learn how to clean Earl Jr.'s D tube, give him CPR, clean his tray, clean his G tube, change his diaper, bathe him and feed him. The G tube is a way to feed the baby directly to his stomach and the entry site has to be cleaned. Reese-Thornton, Sr. also has to make sure no bubbles get into Earl Jr.'s stomach. Earl Jr. has a tracheotomy to help him breathe, which Reese-Thornton, Sr. has to clean 24/7. Earl Jr. has a long list of medicines he takes. Reese-Thornton, Sr. is nervous when he is around Earl Jr. because he might make a mistake and end up causing the death of Earl Jr.

Earl Jr. is three year old and drools all day long and they have to constantly suction him. Earl Jr. can do nothing; he doesn't move. He can't follow, can't point, can't crawl or roll over. Reese-Thornton, Sr. cannot take Earl Jr. to the park or the beach because anything might trigger a seizure.

To date in 2017, Earl Jr. has been in the hospital 6 times. At the time of the trial, he was in the hospital with pneumonia. Reese-Thornton, Sr. no longer lives with the child but spends two to three days per week for several hours per visit taking care of Earl Jr.

### Dr. Martin Gubernick

Dr. Gubernick went to Bucknell University and Northwestern Medical School. He performed his residency at Cornell University in 1986. He has been a board-certified OB/GYN since 1987 and has done approximately 3,000 deliveries.

Dr. Gubernick's opinions are based upon the knowledge, skill and care ordinarily used by a reasonably careful obstetrician under the same or similar conditions. All of his opinions are within a reasonable degree of medical probability unless specified otherwise.

Dr. Gubernick has no issue with the care provided by Dr. Atogho to Dixon prior to December 2, 2013 at 13:50. At 13:25 the fetal heart rate pattern decelerated to 80 beats per minutes. This is very typical of a hypoxic event. At 13:30 the nurse turned off the Pitocin. Every time the uterus contracts, it diminishes blood to the baby, and you don't want to restrict the vessels that are supplying the blood to the baby. Stopping Pitocin was within the standard of care.

At 13:33 the nurse called the doctor. The nurse also did an examination of the mother and determined the mother was fully dilated and complete, and

entering the second stage of labor. At 13:49, 16 minutes after the phone call, the doctor arrived at Dixon's bedside.

Category 1 is a normal tracing for fetal heart beats. Category 3 is an ominous tracing – the most ominous of all tracings. Dr. Atogho determined the baby had a category 3 tracing. Dr. Gubernick believes the tracing was closer to category 2 at this time, but that is still of concern and one would not restart Pitocin with a category 2 tracing.

At 13:50, the Pitocin was restarted. Dr. Gubernick opined that the restarting of Pitocin is just about the last thing you want to do in that situation. If anything, you want to give an agent that stops contractions. It was absolutely below the standard of care for the doctor to restart the Pitocin at 13:50, regardless of whether the tracing was a category 2 or a category 3. From 13:50 to 14:00 the tracing became worse due to the use of the Pitocin.

By increasing fluids to the mother you increase blood flow to the baby. By giving oxygen to the mother, you are increasing blood flow to the baby. By tilting the mother on her side, you are relieving pressure.

The baby was in an occiput posterior ("OP") position - looking up at the sky - which is backwards and makes it much more difficult to place the Kiwi. Only 5% of babies are occiput posterior. Only 3% of all deliveries use a Kiwi device so using a Kiwi device on an OP baby is rarer still. The most effective way to deliver an OP baby that is at plus 1 or plus 2 stations is to use forceps. Forceps are still used but are going out of use by younger generations of OB/GYNs.

Any OB/GYN could have predicted that the Kiwi would not have worked because the baby was OP, at plus 1 or plus 2 stations, and the mother was a 19-year old giving birth to her first baby.

By 14:00, there was a non-reassuring fetal heart rate with a category 2 tracing. With a 19-year old mother having her first child in OP position and the doctor believing it was a category 3 tracing, the standard of care would have been to do a C-section. Even with a category 2 tracing, the doctor should have stopped the Pitocin and that probably would have resolved the issues.

From 14:29 to 14:37 the baby was tachycardic; there had been two failed vacuum attempts and the Pitocin is still running. The baby was not recovering; inadequate resuscitation maneuvers were being done. The baby was subjected to consistent hypoxia. You can't beat the baby up for that long and not have a bad outcome.

A doctor should not let a patient go from a category 1 to a category 3 tracing without taking immediate action. No doctor should perceive these problems and let the problem persist. If a doctor believes that there is a category 3 tracing, he has an obligation to make the case to the mother and

constantly stress to the mother the possibility of death or serious harm to the baby. You never stop making your argument. If the mother does not listen, the doctor should have a nurse, a female OB/GYN, or an administrator speak to her.

It is important for the doctor to know the reason why the mother does not want to have the C-section. Even if the doctor doesn't document at the time, if a patient refuses a C-section, the doctor should have extensive notes about all the efforts he made to convince the patient.

Although doctors often deliver more than one baby at a time, when you have a baby in distress like in this case, you should get a back up to take over the other delivery.

At 14:45, Dr. Atogho returned to the room and applied the vacuum again. The baby was still hypoxic. There were no accelerations in the heart rate, the beat variability was minimal, there was fetal tachycardia and there were recurrent decelerations. The baby remained at least in category 2 and was very close to a category 3.

From 15:00 to 15:21 there was a third attempt with the vacuum; there was still some deceleration and the baby was in trouble. The problem was that the baby had been in trouble for over an hour and twenty minutes at this point. If the baby had been delivered by C-section at 15:05 or before, within a reasonable degree of medical probability the baby would not have suffered damage.

At delivery, the baby had Apgar scores of 2, 3 and 6 at 1, 5 and 10 minutes and a core PH of 7, was extremely floppy and needed aggressive resuscitation. This was a catastrophic event.

There was no indication that Dr. Atogho reached out to another obstetrician.

### Dr. Enme Corrales-Reyes

Dr. Corrales-Reyes is a physician trained in pediatrics in NYC and did his residency in neurology at Vanderbilt.

On December 2, 2013, Dr. Corrales-Reyes began treating Earl Jr. He determined the child had hypoxic ischemic encephalopathy. Dr. Corrales-Reyes treated the child through January 2014. The mother indicated that she had not refused a C-section. Dr. Jayakar's records indicate that the father had told her that the mother had refused a C-section. Such a note would not be common.

When Dr. Corrales-Reyes treated the child, he had gross motor, fine motor, speech and social development delays. The brain was experiencing atrophy and the child was experiencing bilateral cortical thumbing. The child was also experiencing seizures.

Factors that could impact Earl Jr.'s life-expectancy are respiratory problems, feeding problems and neurological problems, including seizures. But statistically 87-90% of the time these types of patients can live up to 30 years.

### A.    Dr. Paul Kornberg

Dr. Kornberg is an M.D. specializing in physical medicine, particularly pediatric rehabilitation in Tampa. Dr. Kornberg graduated from the University of California, Berkeley and then University of Miami Medical School. Thereafter, he completed a 5-year residency at Baylor in pediatrics and physical medicine and rehabilitation, and is board certified in physical medicine and rehabilitation. Dr. Kornberg sees patients similar to Earl Jr. on a regular basis. His focus is on function – either improving the child's activities or training the family on their ability to care for the child.

Earl Jr.'s medical diagnoses are: severe birth-related spastic seizure disorder, profound global developmental delay, spasticity, visual impairment, feeding problems with a history of dysphasia, severe gastric esophageal reflux disease, neuromuscular scoliosis, constipation, sleep apnea, and asthma. The child underwent numerous operative procedures including a tracheotomy and gastrostomy tube placement.

The child is profoundly developmentally delayed. At almost two and a half years, he had not achieved the milestones one would expect of a four month old. The child's scoliosis can cause functional impairment to breathing and heart function and often requires corrective surgery. The child has profound disability and will require round-the-clock care from a variety of specialists, durable medical equipment suppliers, nutritionists, gastroenterologist, neurologists, orthopedic surgery, X-rays, MRI's, CT's and EEG's, bracing to prevent deformity and many other services.

Dr. Kornberg opines the child has a life expectancy of an additional 47.5 years. It is not uncommon for a person with Earl Jr.'s conditions to live 30 to 40 years, and he has treated similar patients who are in their 50's. The child's more significant motor impairment could negatively affect life expectancy. The child is also at high risk for aspirational pneumonia. He has been hospitalized several times for upper respiratory infections. Dr. Kornberg's life expectancy opinion assumes there would be appropriate support and care of the child.

Prior to moving with a child with the conditions of Earl, Jr., a parent should make arrangements for medical care in advance of moving. However, it is not uncommon for parents to move with the child and then look for caretakers. It would be better for the child to use medical transport for any travels of over 100 miles.

Medical records indicate that at one point the mother was called and asked about the child's medications and she did not know the medications. Medical records indicate that on another occasion the mother was called and asked about the child's medication and the mother hung up the phone. Several other medical records indicate the mother did not come in when she was asked to do so and staff could not locate her on other occasions. Other records reflect referrals to the Department of Children and Families because the mother was not complying with doctors' instructions.

**B.  Oscar Padron**

Padron is a Certified Public Accountant with a B.A. in accounting and an M.S. in finance; he is a licensed stockbroker, certified financial planner and certified valuation analyst. Padron was retained by the Plaintiffs' attorneys. He reviewed the life plan prepared by Ira Morris which had various costs, frequencies and durations, and he applied financial techniques to project those costs, frequencies and durations into the future. He then reduced those future amounts to present money value.

Padron prepared two different options because Morris used two different earning capacities: one based on two years of college and one based on a high school degree.

Future lost earning capacity is $2,491,062 for Option 1 and $3,191,792 for Option 2. Future medical costs will be $38,589,086. The projected economic loss is $41,080,148 for Option 1 or $41, 780,878 for Option 2. The present value of lost earning capacity is $822,430 for Option 1 or $922,537 for Option 2. The present value of future medical costs is 20,812,546.

The total present value of projected economic loss is $21,634,976 for Option 1 or $21,735,083 for Option 2. Padron reduced the numbers by $13,000 based upon some corrections by Morris, which reduced the total present value of projected economic loss to $21,621,976 for Option 1, or $21,722,083 for Option 2. Interest rates have gone up since the time of his report, which would further reduce the total present value of projected economic loss to $19,153,352 for Option 1 and $19,265,093 for Option 2.

Padron is hired 80 percent of the time by plaintiffs and 20 percent of the time by defendants, but he testifies about 90 percent of the time for plaintiffs.

**Marla Dixon**

Dixon was born in Jacksonville and lived with her adopted mother and her two brothers. Dixon attended high school in Jacksonville but did not graduate. She decided to go to Job Corps in Homestead. Job Corps has a college-like campus and she studied to be a medical administrative assistant.

Dixon moved to Homestead in 2011 and lived on the Job Corps campus. She finished Job Corps with a high school degree and obtained her certificate. While at Job Corps, she worked as an intern at a hospice facility. When she finished Job Corps, she worked for a temp agency called Empire. At one point she worked concessions at the Sony Open tennis tournament.

Dixon currently lives in Miami Gardens. She has three children: Earl Jr., Serenity and Elijah. The two younger children are perfectly healthy.

Dixon met Reese-Thornton, Sr. on MySpace while she was at Job Corps. They eventually started living together at Reese-Thornton, Sr.'s mother's house in Liberty City. They dated a year and a half before she got pregnant. They wanted to have a child together.

Dixon went to Jessie Trice for prenatal care because that was the only facility that took her insurance. Reese-Thornton, Sr. accompanied her to all the appointments. They knew it was going to be a boy and she was happy because she always wanted a boy first so he could protect his younger sister. There were no complications during the pregnancy. Dixon went to North Shore Hospital prior to her delivery but does not remember how many times. Dixon was nervous about the pain during birth because she does not like pain. She watched videos on YouTube about vaginal deliveries and C-sections.

On December 2, 2013, Dixon was sleeping and thought she had wet the bed but realized her water had broken. She woke up Reese-Thornton, Sr. and went to the hospital. It was around 1:00 or 1:30. Reese-Thornton, Sr.'s mother went with them because she wanted to use Reese-Thornton, Sr.'s car while they were at the hospital. Reese-Thornton, Sr.'s mother did not go into the hospital.

Dixon believes that they arrived at North Shore around 2:00. The security guard took them from the emergency room to the labor/delivery area upstairs, and she was given a room directly across from the nurses' station.

They hooked her up to the fetal monitor strip, gave her an IV and gave her medications. She does not recall which medications. Reese-Thornton, Sr. left around one and a half hours later, around 3:15. Reese-Thornton, Sr.'s mother picked up Reese-Thornton, Sr. They had previously agreed that Reese-Thornton, Sr. would accompany her and stay for a while but would leave because he did not like hospitals. They agreed that she would let him know when to come back and would send him text messages to let him know what was happening. They exchanged many text messages that day.

At 3:40, Dixon signed a consent form and she thought that meant that she was going to have a C-section. Prior to that night, she had decided that she would have a C-section if it were offered to her. The form indicated "consent vaginal delivery possible abdominal delivery external or internal fetal monitor."

At one point, Dixon was told that she was being given a medicine to help her contract more. She also asked for and received an epidural for her pain. She had learned about epidurals from YouTube.

The nurse who initially attended Dixon left, and the second nurse never left the room once she told Dixon she was complete. Dixon doesn't remember much about the first nurse, other than that she was a black woman.

Dixon is unsure of the time that Dr. Atogho arrived but it was in the afternoon when she was fully dilated. She knows she was fully dilated because the nurse told her she was at 10 centimeters. When the nurse told her that, she called Reese-Thornton, Sr. and he came to the hospital. Reese-Thornton, Sr. came back to the hospital around 1:30 p.m.

Dr. Atogho had not been in the room to see her before Reese-Thornton, Sr. arrived. Dr. Atogho arrived in the room 10 to 15 minutes after Reese-Thornton, Sr. However, in her deposition, Dixon testified that Reese-Thornton, Sr. arrived after the Kiwi popped off the first time.

Dixon had never seen Dr. Atogho before that moment. Reese-Thornton, Sr., the nurse and the two student nurses were in the room with Dr. Atogho arrived. Dr. Atogho examined Dixon and told her it was time to push. Dr. Atogho had a "suction thing" and he put it down by the baby. After awhile it popped off. Dr. Atogho never offered Dixon a C-section. Dr. Atogho never told her the baby could suffer brain injury or death if she did not have a C-section. No one ever told her the baby was facing in the wrong direction.

Dr. Atogho left the room after he was unsuccessful in delivering the child. Prior to his leaving, Dixon asked Dr. Atogho to cut her because of her pain but he did not answer. In her deposition, Dixon indicated that she had learned through YouTube and Google that the pain after a C-section is horrible.

Dr. Atogho was gone for about 40 minutes. While Dr. Atogho was gone, the nurse had her continue to push. When Dr. Atogho came back in the second time, he tried to use the vacuum device again. She was told to push with her contractions. Reese-Thornton, Sr. and the nurse each held one of her legs. During the second time Dr. Atogho was in the room, he never offered her a C-section and never told her if she did not have a C-section, the baby could suffer an injury. Nothing had happened which would have changed her mind about consenting to a C-section. Dixon again asked Dr. Atogho to cut her.

After Dr. Atogho was unsuccessful a second time, he left the room for 15 minutes. When Dr. Atogho came back, he did not offer Dixon a C-section and never said anything about the baby being in distress. Dr. Atogho used the vacuum device a third time. Dr. Atogho still was not successful. Dr. Atogho left the room a third time. She continued to push with the nurse and Reese-Thornton, Sr.

Dr. Atogho was not present when the baby came out, and the nurse is the one who actually caught the baby. The baby was blue and floppy and wasn't crying. Dixon thought the baby was dead. The nurse put tubing in the baby's mouth to try to get him to breathe. Dr. Atogho came back into the room a few minutes later and delivered the placenta. The NICU staff also came into the room and took the baby with them. Dr. Atogho stayed with Dixon until she delivered the placenta. Dixon was then taken to a recovery room.

The next day, Dr. Atogho came to Dixon's room and told her she should have pushed harder. This made Dixon feel it was her fault. That was the last time she saw Dr. Atogho.

Dixon stayed in the hospital for four to five days. The baby was transferred to Miami Children's Hospital on December 3, 2013. He stayed at Miami Children's until January 27, 2014. They were trying to control his seizures. They also had to put in a G-tube through his stomach because he could not eat through his mouth. The doctors at Miami Children's told her the cause of the injury was lack of oxygen at the time of the birth. Dixon blamed herself because Dr. Atogho told her she should have pushed harder.

Dixon has learned how to care for Earl Jr. and to do all the tasks the nurses do when they are there. A nurse is there from 4:00 p.m. until 6:00 a.m. Dixon has caught the nurses sleeping numerous times. If the nurse is late or does not show up, Dixon has no time to prepare her own meals and the other two children's dinner.

Dixon was able to name several of the medications that Earl Jr. takes. She does her best to give him his medications. Earl Jr. has been to doctors' appointments more than 10 times so far this year. Three days before any appointment, Dixon has to make arrangements for another nurse to come and accompany her and Earl Jr. to the doctor's appointments. Earl Jr. has been in the hospital 7 times so far this year for about 2 weeks each time.

Earl Jr. is able to smile, and smiles when he recognizes Dixon's voice or Serenity's voice. He doesn't smile when he hears other voices. He can't walk, crawl or sit up. He has to be propped up into a sitting position and even then he falls over. He can't move his head and can't reach out to her. He cannot speak. He is not potty-trained and has to wear adult small diapers.

Dixon cannot work because she has to watch Earl Jr. at all times. It is especially hard because she has two other, younger children. Dixon can't do any normal activities with Earl Jr. and can't even take him outside. Dixon's own activities are greatly curtailed.

Earl Jr.'s problems created lots of problems between Reese-Thornton, Sr. and Dixon. They fought about money and who would watch Earl Jr., and they

were both physically tired. These problems caused her and Reese-Thornton, Sr. to break up.

At one point, Dixon moved to Jacksonville to get a job and have the support of her mother. She did not have a car and had to take a bus or get a ride from her sister to go to the hospital to see Earl Jr. While she was in Jacksonville, she had Serenity with her and was also six months pregnant. She didn't always go to see Earl Jr. as often as she wanted but she had a lot going on and did not have transportation. Dixon decided to move back to Miami because Reese-Thornton, Sr. agreed to help her with Earl Jr.

### Ira Morris

Morris is a rehabilitation counselor and life care planner. He holds national certifications as a rehabilitation counselor, vocational evaluator and life care planner and has been working in this field and preparing life care plans since 1994. Morris was asked to develop a life care plan for Earl Jr. Morris reviewed medical records, met with the family, conferenced with treating physicians and performed an in-person assessment. He determined the necessary and reasonably probable treatments and their costs for the future care of Earl Jr.

Morris looked at the cash-pay and self-pay costs of the goods and services. He did not take into account any third-party sources. With the imminent repeal of Obamacare, it is unknown what insurance, if any, would be available.    For all costs and services, Morris contacted numerous vendors and provided all of those numbers to the economist so the economist would have a range from which to choose.

Earl Jr. will need 24-hour nursing for the rest of his life. The current rental apartment in which the family lives is too small to accommodate Earl Jr.'s needs. It would cost $70,000 to $75,000 to make modifications of a rental apartment or rented residence. It does not make economic sense to spend that much money to modify an apartment or home on a temporary basis. Morris believes it is medically necessary for a private residence to be purchased that can be modified appropriately to accommodate Earl Jr.'s needs.

Morris surveyed homes in the area in which the family lives and determined that a home for Earl Jr. at age 19 would cost $175,465.

In addition to an LPN, Earl Jr. would need to utilize a housekeeper and someone to provide home maintenance. If he travels outside the home, he would need a home health care aide to drive so the LPN can focus on him and suction him constantly. The mother has two other children and she needs time to attend to the needs of the other two children.

Morris had not reviewed the depositions of Marla Dixon, Earl Reese-Thornton, Sr. or Dr. Corrales-Reyes prior to preparing his report.

**Dr. Jerry Tomasovic**

Dr. Tomasovic is a specialist in child neurology. He graduated from University of Chicago Medical School in 1965 and did a two-year residency in pediatrics and four years of practice in the United States Navy. He is board certified in pediatrics and adult and child neurology. He practices at two level-three nurseries staffed by neonatal nurses and neonatal neurologists. He works on a daily basis from 8:00 a.m. to 5:00 p.m. and his practice is limited to children. However, he follows some of his patients into their adulthoods. He sees about 25 patients per day. Dr. Tomasovic has had many patients with the same disabilities as Earl Jr.

Dr. Tomasovic was involved in training in pediatrics and neurology for many years. He has published on many occasions and has hospital and consulting staff privileges at two medical facilities. He has been accepted as an expert in the field of child neurology in other courts. All of his opinions are within a reasonable degree of medical certainty.

Dr. Tomasovic reviewed records of the prenatal care of the mother, her obstetrical records, the child's post-natal care and treatment records from numerous hospitals and caretakers of Earl Jr. as well as depositions of many of the depositions in the case. Dr. Tomasovic performed a physical examination and observation of Earl Jr. to determine his level of neurologic function at the time. The parents, nurse, attorney and life care planner were present.

The child has limited ability to control his head and trunk. Such movement is important because it helps reduce the effects of infections. Moving the body and expanding the lungs is important to fight infections, particularly pneumonia.

The child's inability to grasp shows he was not able to perform tasks on a voluntary basis. The child had a spontaneous smile but not a responsive smile. Some people misinterpret this smile as being attributed to socialization. Dr. Tomasovic attempted to have the child perform simple commands. The child did sustain some eye movement, but the child did not respond to his whispering of "mommy." The child did not have the ability to track a visual image. He used a tape that has alternating images which 50% of newborns will pick up on and their eyes will track it.

Dr. Tomasovic measured the size of the child's head circumference. The head had a circumference of 42 centimeters. Dr. Tomasovic conducted a frontal lobe assessment and a jaw jerk with abnormal results. Dr. Tomasovic was able to confirm the findings of Dr. Corrales-Reyes. The intractable epilepsy of the

child, even though not as bad as earlier, will trigger increased secretions which sets him up for aspiration and pneumonia and is often the cause of the ultimate demise of many children with Earl Jr.'s conditions.

Dr. Tomasovic concluded that Earl Jr. is in a near persistent vegetative state. He would need more time with the child to conclude whether the child is in a persistent vegetative state. Earl Jr. has irreversible permanent neurological damage and has no significant voluntary functioning. He can provide no self-care and is totally dependent on his family and others for all of his needs, including feeding. His tracheotomy and feeding tube are permanent.

Dr. Tomasovic believes the life expectancy of the child is 12 to 15 years of age. His opinion is based upon a study performed from 1966 to 1992. The study does not indicate how many of the children had 24-hour nursing care, which would probably increase life expectancy. There is a 50% chance Earl Jr. will outlive the life expectancy of 12 to 15 years and a 50% chance he will live beyond the defense's life care plan. The most common causes of death in children with Earl Jr.'s conditions are cardio-pulmonary infections. The damage impairs the ability to combat frequent, recurring infections to the point of limiting restriction of the lungs to respond to these illnesses.

Dr. Tomasovic reviewed the life care plan of Ms. Riddick-Grisham. Earl Jr. has averaged 75 days per year of hospitalization so far in his life, yet the defense's life care plan only anticipates 1 day of hospitalization per year.

### Susan Riddick-Grisham

Riddick-Grisham was asked to prepare a life care plan Earl Jr. She has been a licensed registered nurse for 41 years, and is a certified case manager and certified life care planner.

She started as a nurse in the New York State Department of Mental Health managing two units of adults with mental retardation and intellectual disability. She later worked for Allied Chemical Corporation and worked for Crawford Corporation managing patient care. She later became the director of medical services for Paradigm until she left to start her own company. She has taught and written, and has previously testified as an expert in the field of life care planning. She has done hundreds of life care plans for individuals with similar conditions as Earl Jr.

Riddick-Grisham reviewed extensive medical records and school records of Marla Dixon, school records for Reese-Thornton, Sr., and numerous hospital and doctors and medical records of Earl Jr.Riddick-Grisham met with the family in July 2016 together with Dr. Tomasovic. They met in the one-bedroom apartment where Earl Jr. lived. The mother and father, a nurse and two attorneys were also present.

Riddick-Grisham's life care plan goes to age 15 but she is not offering an opinion on life expectancy. The total cost of Riddick-Grisham's life care plan is $4,094,388.70 through age 15. The life care plan does not include the cost of buying a home for Earl Jr. and only allows for 9 days of future hospitalization. If Dr. Tomasovic agreed that a home was needed and that more hospitalization might be needed, she would not quarrel with that.

### Dr. Frederick Raffa

Dr. Raffa is a senior economist at Raffa Consulting Firm. An economist is someone who is concerned with how values are determined and whether those values efficiently allocate and efficiently produce the standard of living we all desire. Dr. Raffa graduated from Florida State University with a B.A. in business administration in 1965, a Masters' degree in business administration in 1966 and a PhD in economics in 1969. He eventually became a tenured professor.

As of August 2016, Dr. Raffa determined that the present value of Riddick-Grisham's life care plan was $4,264,657, and was based upon the numbers being valid as of January 2017. He has revised his opinion based upon the March 2017 trial date and also based upon a change in the inflation rate. His current opinion is that Riddick-Grisham's life care plan has a present value of $4,140,800. If the child happened to outlive the estimated life expectancy, the present value of each additional year of care would be approximately $360,000 to $370,000 per year.

### Dr. Michael Berkus

Dr. Berkus graduated from the University of Florida Medical School in 1976 and is board certified in OB/GYN and in maternal fetal medicine. He is an associate professor and has delivered over 3,000 babies. He has testified at least 35 times. He has published papers on the use of forceps versus vacuum extractors and co-published a book on forceps and all extractor devices. He has been a reviewer for the American Journal of Obstetrics and Gynecology. He also acted as an advisor to a company that manufactured vacuum extractors.

Dr. Berkus was asked to opine on the standard of care as to Dr. Atogho's use of the Kiwi device, and whether any of Earl Jr.'s injuries were attributable to a breach of care concerning the use of the Kiwi. All of his opinions are to a reasonable degree of medical certainty. Dr. Berkus reviewed numerous medical records of the care of Dixon and birth of Earl Jr. as well as the depositions of numerous witnesses. He also spoke with Dr. Atogho.

Vacuum extraction devices use a small cup that attaches to the scalp of the fetus in the vaginal canal. When the mother pushes, the doctor pulls on the

vacuum extraction device to assist the mother. The device has a gauge to show how much force is being pumped. If Dixon refused a C-section, Dr. Atogho's use of the device met the standard of care, even at the plus 1 or plus 2 stations.

Dr. Atogho applied the vacuum extractor three times. He used it from 14:00 to 14:05, at which time it popped off. A safety feature of the instrument causes the cup to pop off if there is too much pressure. The device was used a second time from 14:46 to 14:51, at which time it popped off again. The device was used a third time for five minutes starting at 15:01.

The device is designed to be used for babies in the occiput posterior position. The use of forceps in the hands of someone familiar with forceps would have been the better choice, but Dr. Atogho had not used forceps in a long time. Dr. Berkus opined that Dr. Atogho's use of the vacuum extractor did not cause or contribute to any of the babies' injuries.

If Dr. Atogho had not offered a C-section then his use of the Kiwi would have been in violation of the standard of care. The standard of care would have required Dr. Atogho to have offered a C-section within a few minutes of 13:49 after he had read the fetal monitor strips. If Dr. Berkus had a mother who refused a C-section he would have told her of the risks to the baby and would have delineated those risks in his notes.

### Dr. Frank Ling

Dr. Ling is an OB/GYN in private practice in Germantown, Tennessee. He graduated from University of Texas Southwestern Medical School, completed a three-year residency at University of Tennessee in Memphis and stayed on the faculty for 25 years. For the past 14 years, he has been in private practice. He has been an examiner for the American Board of Obstetrics and Gynecology and later was chairman of the board. He is board certified and has been an expert witness in numerous cases. Since 1999, Dr. Ling has testified in trial or deposition 39 times and has always testified for a doctor or a hospital.

Dr. Ling was asked to review records and other evidence in the case by the Government including the pre-natal care, hospital records from the birth, imaging records, medical records on the care of the newborn and numerous depositions. Dr. Ling prepared a report of his findings. Dr. Ling is familiar with the standard of care in relation to the duties of an OB/GYN attending to a delivery. The American College of Obstetricians and Gynecologists (ACOG) is an educational body for its members. ACOG publishes numerous educational materials designed to provide guidance to practicing OB-GYNs.

Dr. Atogho was not present when Dixon first arrived at the hospital at approximately 2:00, but he did issue orders for her care such as epidural and Pitocin. Dr. Ling does not believe Pitocin was contraindicated once Dixon refused a C-section, does not believe Dr. Atogho working on other deliveries that day fell below the standard of care and does not believe another doctor should have been called in for help.

Dr. Ling believes it was within the standard of care for Dr. Atogho to offer a C-section, but a C-section was not required. In his deposition, he answered that a C-section was required. If Dr. Atogho believed the baby was in jeopardy and had never offered a C-section it would have been below the standard of care. Dr. Ling opined that the use of Pitocin and use of the Kiwi were appropriate only because the patient had refused a C-section. All of Ling's opinions are based upon the assumption that Dr. Atogho offered C-section and that Dixon refused.

## 2. Findings of Fact

### A. Background

On February 28, 1994, Marla Tamika Dixon was born in Jacksonville, Florida. She attended high school in Duval County, Florida, and completed her high school education at the Job Corps in Homestead, Florida. While in the Job Corps, Dixon first learned she was pregnant.

Earl Reese-Thornton, Sr., was born October 27, 1990. He graduated from Miami Northwestern Senior High in 2010. From March 2013 through 2014, Mr. Reese-Thornton, Sr. worked with Empire Staffing. Since April 2014, Mr. Reese-Thornton, Sr. has worked for C&S Wholesale Grocery.

Dr. Ata Atogho was born in Cameroon in 1973. After graduating from high school, he immigrated to the United States and earned a Bachelor of Science Degree in Biology. Dr. Atogho earned his medical degree in 2003. Thereafter, he interned and served his residency specializing in OB/GYN, finishing in 2008. In July 2008, Dr. Atogho was licensed to practice medicine in Florida and in August 2008, he began working as an OB/GYN. On March 12, 2013, Dr. Atogho was hired by Jessie Trice. Dr. Atogho is a Fellow of American College of Obstetricians and Gynecologists. As of December 2013, Dr. Atogho had delivered approximately 2,000 babies.

**B.    Ms. Dixon's Pregnancy and Delivery**

Dixon received prenatal care from Jessie Trice. Jessie Trice is a federally supported health center. The pregnancy was normal and without complication until the day of the birth. Dixon did not participate in formal pre-natal education, but she learned about C-section and vaginal deliveries by watching YouTube videos.

On December 2, 2013, at approximately 1:00 a.m., Dixon went into labor. She presented at North Shore at approximately 2:00 a.m. Upon admission to North Shore, Dixon signed a consent form which acknowledged her general consent to treatment as well as her right to refuse any medical treatment. The consent form indicated that she was agreeing to a vaginal delivery as well as any other surgical procedures required in the course of delivery.

Yolande McCray, a nurse at North Shore, was assigned to provide care for Ms. Dixon during her labor and delivery once her shift began at 7:00 a.m. Dr. Atogho, who was offsite, was advised that Dixon was in labor and issued orders admitting Dixon and addressing her care, including continuous external fetal monitoring. He ordered a Low-Dose Pitocin regime should contractions become irregular. The order required McCray to stop Pitocin if there was evidence of fetal distress.

Dixon's labor was uneventful until approximately 13:20 when fetal heart rate tracings showed deceleration of the baby's heart rate. Pitocin, which had been started at 9:46, was turned off at 13:30 because of a non-reassuring heart rate. At about 13:33, McCray charted her vaginal examination, revealing Dixon to be fully dilated (marking the end of Stage One, and beginning of Stage Two Labor) with the baby descended to +1 station. McCray notified Dr. Atogho on his cell phone of the deceleration and the conditions indicating that the baby was ready to be delivered.

Dr. Atogho arrived at Dixon's bedside for the first time at 13:49. Fetal monitoring indicated the baby had a non-reassuring heart rate indicative of hypoxia (oxygen deprivation). Dr. Atogho believed that the fetal monitoring indicated that Earl Jr. had a category 3 heart rate. Pitocin was restarted once Dr. Atogho arrived. Dr. Atogho continued infusing Pitocin into Dixon from 13:50 until 15:21, when Earl Jr. was delivered. Pitocin was contraindicated because of the baby's non-reassuring heart rate, and further impaired the flow of blood and oxygen to the baby. Dr. Atogho failed to use appropriate fetal resuscitation measures to correct the non-reassuring fetal heart rate.

From 13:49 through 15:21 Dr. Atogho believed that Earl Jr. was in imminent danger of hypoxic injury, brain damage or death. Nonetheless, he continuously left Dixon's room to treat another patient, and he delivered that

other baby at 15:08, just minutes before Earl Jr. was born. During that same time, Dr. Atogho also made an eight-minute phone call to his financial advisor.

Between 13:49 and 15:21, Dr. Atogho used a Kiwi vacuum device on three occasions. At 15:21, Ms. Dixon delivered Earl Jr. vaginally. When Earl Jr. was delivered, he was blue and not breathing. Shortly after birth, the Neonatal Intensive Care Unit ("NICU") team was called and assumed care for the baby. Earl Jr. was transferred the following day to Nicklaus Children's Hospital, where he was later diagnosed with hypoxic ischemic encephalopathy and brain damage from oxygen deprivation.

The Court finds the testimony of Dixon and McCray to be more credible than the testimony of Dr. Atogho and Dr. Jayakar concerning whether or not Dr. Atogho offered Dixon a C-Section. According to Dixon and McCray, Dixon requested a C-section several times and Dr. Atogho never offered one. McCray testified that she was present with Dixon throughout the second stage of labor when Dr. Atogho was also present, and that Dixon requested a C-section several times in the course of the delivery. McCray corroborated Dixon's testimony that Dr. Atogho never offered a C-section, and responded to Dixon's multiple requests for a C-section by directing her to "keep pushing." Dr. Atogho was never present with Dixon at a time when McCray was not present.

McCray also would have noted the refusal in her notes and her neonate treatment report would have noted the mother's refusal to have a C-section. Dr. Atogho hand-wrote in the hospital chart, after the fact, "declined c/s," indicating that Dixon refused a C-section. When McCray saw this note, she asked Dr. Atogho why he wrote "declined c/s" in Dixon's chart, when Dixon never declined the C-section. Dr. Atogho responded that it was Dixon's first baby and she didn't need a C-section. McCray testified that the note Dr. Atogho added to the chart was "a lie."

The Court has not considered the testimony of Reese-Thornton, Sr. on this issue because the Court is unsure whether Reese-Thornton, Sr. was there the entire time Dr. Atogho was bedside. There was some testimony raising questions as to whether he was even present the first time Dr. Atogho applied the Kiwi device. So, while the Court credits Reese-Thornton, Sr.'s testimony that while Reese-Thornton, Sr. was in the room Dr. Atogho did not offer a C-section, Reese-Thornton, Sr. cannot be relied upon in determining whether Dr. Atogho ever offered a C-section.

The finding that no C-section was offered by Dr. Atogho is further supported by Dr. Atogho's failure to follow the hospital's required procedure of filling out and having Dixon sign an "AMA" or "Against Medical Advice" form. Also, the Court credits the testimony of Dr. Gubernick that Dr. Atogho's failure to "call in the cavalry" to convince her to have the C-section and Dr. Atogho's

failure to document all efforts to convince her to do so in his notes is indicative of his failure to have offered a C-section. Dr. Corrales-Reyes, a pediatric neurologist who saw Earl Jr. at Nicklaus Children's Hospital shortly after his birth, indicated that Dixon told him she never refused a C-section.

The Plaintiffs' OB/GYN expert, Dr. Gubernick, testified that Dr. Atogho's actions – restarting Pitocin, leaving Dixon's bedside to deliver another baby, calling his financial advisor, and faing to document the risks associated with refusing a C-section – were inconsistent with recommending, ordering, or preparing for a C-section.

Dr. Parul Jayakar, a geneticist at Nicklaus Children's Hospital, saw Earl Jr. to determine the nature of the then unidentified condition. Dr. Jayakar's notes include the statement "mother refused C/S." It is unclear whether this note came from her review of Dr. Atogho's note in the chart or whether it was based upon a statement to her by Reese-Thornton, Sr. But the Court has already determined that Reese-Thornton, Sr. is not a reliable witness for this issue and therefore finds that Dr. Jayakar's testimony is not helpful to the Court on this issue.

### C. Standard of Care

Plaintiffs presented the testimony of expert Dr. Martin Gubernick, a board certified OB/GYN and clinical instructor at Cornell Medical School, who has had a clinical practice at New York Presbyterian Hospital since 1986 and has treated thousands of patients. The Court finds Dr. Gubernick extremely qualified and finds his opinions more reliable than the defense experts. Based upon Dr. Gubernick's testimony, as well as the other credible testimony and evidence in the case, Dr. Atogho breached the standard of care by restarting the Pitocin, which was contraindicated and extremely dangerous, and that this was a gross deviation from good and acceptable practice.

Dr. Gubernick testified that it was extremely rare, and almost unheard of, that a mother would refuse a C-section when confronted with information that her baby could suffer brain damage, or even death, without it. There was no documentation that Dr. Atogho offered or recommended a C-section and that, even if he did make the offer, he didn't do enough to convince the mother to have the C-section. According to Dr. Gubernick, Dr. Atogho should have "brought in the cavalry" to convince Dixon to have the C-section. A nurse, other doctor and administrator should have been brought in to speak to Dixon and to explain the extreme risk to the baby. Further, Dr. Atogho should have documented his efforts to convince Dixon to have a C-Section, rather than simply writing "refused c/s."

The Court finds that starting Pitocin, augmenting Dixon's labor at 13:50 and using multiple attempts with a Kiwi vacuum was a gross deviation from good and acceptable practice. The Court also accepts Dr. Gubernick's opinion that it was below the standard of care for Dr. Atogho to leave Dixon for any reason after he had determined Earl Jr. was in distress. Given Earl Jr.'s markedly abnormal heart rate and Dr. Atogho's inappropriate use of Pitocin, a C-section should have been performed by 14:00 and it was below the standard of care for Dr. Atogho to have failed to offer a C-section to Dixon.

The care Dr. Atogho provided to Dixon on December 2, 2013 fell below the standard of good and acceptable practice and directly caused significant neurologic injury to Earl Jr.

### D. Causation

The vaginal delivery caused Earl Jr. to suffer from excessive blood/oxygen deprivation leading to hypoxic ischemic encephalopathy. Dr. Atogho's refusal to perform a C-section when it was required, despite Dixon's repeated requests, caused Earl Jr.'s injuries. In fact, Dr. Atogho tried to cover his tracks by inserting a false note in Dixon's chart. His act reflects consciousness of guilt. *See Busbee v. Quarrier*, 172 So. 2d 17, 22 (Fla. Dist. Ct. App. 1965) (quoting Wigmore on Evidence for the proposition that "a party's. . . fabrication of evidence. . . and all similar conduct, is receivable against him as an indication of his consciousness that his case is a weak or unfounded one; and from that consciousness may be inferred the fact itself of the cause's lack of truth and merit."). In addition, Dr. Atogho's restarting of the Pitocin, which was contraindicated because it restricted oxygen to Earl Jr., also caused Earl Jr.'s injuries.

The Court finds that Dr. Atogho's departure from the standard of care, including his refusal to perform a C-section, proximately caused Plaintiffs' injuries.

### E. Damages

#### 1.) Life Care Plan

As a starting point, the Court finds the life care plan of the Plaintiffs to be more reliable than the life care plan of the Defendants. Here are just two examples of the lack of reliability of the Defendant's plan: the plan calls for an additional 9 days of hospitalization during the next 12 years of Earl Jr.'s life, yet Earl Jr. has already been hospitalized for over 75 days in the first three years of his life. The Court finds the testimony of Ira Morris, an expert in rehabilitation counseling and life care planning who prepared a Life Care Plan

for Earl Jr., to be more reliable than the Defendant's expert. Morris detailed Earl Jr.'s needs for the rest of his life, including medical and therapeutic treatment, medications, equipment, supplies, attendant care, transportation and special residential needs.[1]

### 2.) Life Expectancy

The parties' experts do not materially disagree on the present medical diagnoses; nor is there much disagreement on the treatment that Earl Jr. will need in the future. The real, significant disagreement between the Plaintiffs' expert, Dr. Paul Kornberg, and the Defendant's expert, Dr. Jerry Tomasovic, is in their opinions on the life expectancy of Earl Jr. The Court found both experts to be supremely experienced, caring and qualified, which has made this particular factual finding most difficult for the Court.

The parties agree that Earl Jr.'s medical diagnoses are: severe birth related spastic seizure disorder, profound global developmental delay, spasticity, visual impairment, feeding problems with a history of dysphasia, severe gastric esophageal reflux disease, neuromuscular scoliosis, constipation, sleep apnea, asthma.

The child has already undergone numerous operative procedures including a permanent tracheotomy and permanent gastrostomy tube placement. The child is profoundly developmentally delayed. At almost two and one half years, he had not achieved the milestones one would expect of a four-month old. The child's scoliosis can cause functional impairment to breathing and heart function and often requires corrective surgery. The child has profound disability and will require round-the-clock care from a variety of specialists, durable medical equipment suppliers, nutritionists, gastroenterologist, neurologists, orthopedic surgery, Xrays, MRI's, CT's and EEG's, bracing to prevent deformity and many other services.

Dr. Kornberg opines the child has a life expectancy of an additional 47.5 years. It is not uncommon for a person with Earl Jr.'s conditions to live 30 to 40 years and he has treated similar patients who are in their 50's. But Dr. Kornberg acknowledges that the child's more significant motor impairment would negatively affect life expectancy. The child is also at high risk for aspirational pneumonia. He has been hospitalized several times for upper respiratory infections. Dr. Kornberg's life expectancy opinion assumes there would be appropriate support and care of the child.

---

[1] The Court has not considered the information of Dr. Katz contained in Morris's report since Dr. Katz did not testify.

Dr. Tomasovic points out that the intractable epilepsy of the child, even though not as bad as earlier, will trigger increased secretions which sets the child up for aspiration and pneumonia and is many times the cause of the ultimate demise of many children. Dr. Tomasovic concluded that Earl Jr. is in a near persistent vegetative state. He would have needed more time with the child to conclude whether the child was in a persistent vegetative state. Dr. Tomasovic considered that Earl Jr. has irreversible permanent neurological damage and has no significant voluntary functioning. He can provide no self-care and is totally dependent on his family and others for all of his needs, including feeding. His tracheotomy and feeding tube are permanent.

The most common causes of death in children with Earl Jr.'s conditions are cardio-pulmonary infections. The damage impairs the ability to combat frequent, recurring infections to the point of limiting restriction of the lung to respond to these illnesses.

Dr. Tomasovic believes the life expectancy of the child is 12 to 15 years of age. But this opinion is based largely upon a study performed from 1966 to 1992. The study does not indicate how many of the children had 24-hour nursing care, and 24-hour nursing care would probably increase life expectancy. And Dr. Tomasovic has had his own patients with similar conditions who have lived decades. There is a 50% chance Earl Jr. will outlive the median life expectancy of 12 to 15 years and a 50% chance he will live beyond the defense's life care plan. Of course, statistically there is a 50% chance he would live less than the median.

The Court finds that the life expectancy of Earl Jr. is 30 years, or an additional 27.5 years. This is based upon several factors. He will have 24-hour nursing care which will lead to a longer life than the 12 to 15 years the Defendant's expert believes. Both Dr. Kornberg and Dr. Tomasovic have had patients with similar conditions live for 30 years. Because of the severity of Earl Jr.'s condition, particularly his lack of mobility and his constant secretions, the Court believes he is at a higher risk to succumb to infection. And, though the parents are loving and caring, their conduct to date has demonstrated that they are not hyper-vigilant, which the Court finds is a necessary factor to reach the outer limits of life expectancy proposed by Dr. Kornberg.

### 3.) Economic damages
#### a. Past economic damages

The following past medical expenses for Earl Jr. establish the Plaintiffs' past economic damages:

| | |
|---|---|
| Medicaid | $178,678.85 |
| Sunshine State Health | $162,498.30 |
| Children's Medical Services | $482,172.76 |
| **Total past economic damages:** | **$823,349.91** |

#### b. Future economic damages

The Court finds that future medical expenses shall be calculated using the Plaintiffs' life care plan, but for 27.5 years instead of 47.5 years, and that figure shall be reduced to present money value.

The Court further finds that the future earnings calculation of the Plaintiffs for Option 1 shall be utilized to calculate future lost earnings of Earl Jr. and that figure shall be reduced to present money value.

The Court previously entered a non-final order [ECF No. 168] advising the parties of its findings on the issues of life expectancy and life care plans. The parties were ordered to recalculate Earl Jr.'s future economic damages and have the economist reduce the sum to its present money value. The Plaintiffs filed their Proposed Finding on Future Economic Damages [ECF No.]. The Defendants do not dispute the mathematics of the Plaintiff's Proposed Finding.

The Court, based upon a life expectancy of 27.5 years and utilizing the Plaintiffs' expert's life care plan (except for the purchase of a home for Earl Jr.) sets for the following future economic damages for Earl Jr.

| | |
|---|---|
| **Loss of future earnings:** | $3,056,476 |
| | $877,885 present money value |
| **Future medical expenses:** | $17,908,670 |
| | $12,159,709 present money value |
| **Total future economic damages:** | **$20,965,146** |
| | **$13,037,594 present money value** |
| **Total economic damages:** | **$21,788,495.91** |
| | **$13,860,943.91 present money value** |

### 4.    Non-economic damages

The Court cannot imagine a more devastating turn of events for parents expecting the birth of their first child where there had been no complications during the pregnancy. At the anticipated, joyful moment of birth of a crying, bouncing baby, they are instead presented with the dreadful specter of a blue, floppy, lifeless child. Although life as a parent of any child is challenging and frustrating and can be overwhelming, the life of a parent of a child who is as profoundly and permanently injured as Earl Jr. is almost unimaginable and must sometimes be unbearable. To be sure, at times this life has proven to be too much for the mother and father, who have each sought temporary respites from the burdens of parenting this child. These circumstances would test the limits of even the most mature and dedicated parents. Their momentary failures to be omnipresent are more indicative of their pain and suffering and loss of enjoyment of life than of an absence of it. Yet they have returned to their duties and accepted their fates as parents of this special needs child and, for the next quarter century or so, such will be their lot in life. Who would accept any sum of money to be in their shoes?

The United States argued that the parents haven't really suffered because no evidence was presented that they have suffered from, or been treated for, depression, and that the child has not suffered and should not receive much in non-economic damages because the child is not self-aware enough to enjoy the benefits of those monies. But the Government underestimates the value of the loss of the simple pleasures in the life of a parent and his or her child: having the baby recognize you and smile at you, reading a book at bedtime, holding hands with your toddler as you walk on the beach, receiving a hug from your child after a day at work, teaching your child to read, throwing a football together, going to the movies, going to sporting events, working on school homework together. These and so much more are the simple joys that neither the parents nor the child in this case will ever know. And they should each be properly compensated for their losses of these simple yet significant life experiences. In making this award, the Court has considered the testimony in the case, the facts of this case, the status of the parties, the amount allowed for compensatory damages and the philosophy and trend of other awards made by judges and juries in similar cases. In assessing the awards to the mother and father, the Court has taken into consideration the total amount of time each parent has spent and will be spending with Earl Jr.

### a. Past non-economic damages

| | |
|---|---|
| Earl Jr. | $750,000 |
| Marla Dixon | $300,000 |
| Earl Reese Thornton, Sr. | $100,000 |
| **Total past non-economic damages** | **$1,150,000** |

### b. Future non-economic damages

| | |
|---|---|
| Earl Jr. | $6,875,000 |
| Marla Dixon: | $3,000,000 |
| Earl Reese Thornton, Sr.: | $1,000,000 |
| **Total future non-economic damages** | **$10,875,000** |
| **Total non-economic damages** | **$12,025,000** |

## 3. Conclusions of Law

The Court has jurisdiction over this action pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671, *et seq.* The FTCA subjects the United States to liability for money damages for personal injuries that result from the negligence of its employees while acting within the scope of their employment. *See* 28 U.S.C. § 2672. Federally qualified health centers and employees of such centers acting within the scope of their employment are deemed to be employees of the United States for medical malpractice purposes. *See* 42 U.S.C. § 233.

On December 2, 2013, Dr. Atogho was employed by Jessie Trice and was treating Plaintiffs Dixon and Earl Jr. within the course and scope of his employment. Jessie Trice and Dr. Atogho are both deemed federal employees for the time period at issue in this action. Thus, the United States is liable for any personal injuries caused by the negligence of Dr. Atogho and, by extension, Jessie Trice, in the course of Dr. Atogho's care of Dixon and Earl Jr.

Pursuant to the FTCA, the liability of the United States is determined "in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b). Because the acts and omissions in this case occurred in Florida, the applicable substantive law is Florida medical malpractice law. Under Florida law, the plaintiff in a medical malpractice suit must establish that the alleged actions of the health care provider represented a breach of the prevailing professional standard of care for that health care provider. Fla. Stat.

§ 766.102(1). The prevailing professional standard of care for a given health care provider is that level of care, skill, and treatment which, in light of all relevant surrounding circumstances, is recognized as acceptable and appropriate by reasonably prudent similar health care providers. *Id.* The Florida Supreme Court has further stated that to prevail in a medical malpractice case, a plaintiff must establish the standard of care owed by the defendant, the defendant's breach of the standard of care, and that the breach proximately caused the damages claimed. *Gooding v. Univ. Hosp. Bldg., Inc.,* 445 So. 2d 1015, 1018 (Fla. 1984).

The Court's factual findings establish that by virtue of the medical provider-patient relationship between Dr. Atogho and Marla Dixon and Earl Jr., the United States, through Dr. Atogho, owed a duty to Marla Dixon and Earl Jr. to provide care and treatment that complied with the prevailing professional standard of care. The United States, through Jessie Trice and Dr. Atogho, had and undertook the duty to provide Marla Dixon and Earl Jr. medical care and services in accordance with the level of care that is recognized as acceptable and appropriate by reasonably prudent similar health care providers. Dr. Atogho breached the standard of care by: (1) restarting the labor stimulation medication Pitocin when it was contraindicated because of Earl Jr.'s non-reassuring heart rate; (2) not performing or ordering or recommending a C-section when it was urgently needed and Dixon requested it; and (3) leaving Dixon for a prolonged period of time when her baby was in distress to deliver another baby and call his financial advisor. Dr. Atogho's negligence proximately caused Earl Jr.'s injuries.

### 4. Damages

The components and measure of damages in suits brought under the FTCA are determined according to the law of the state where the tort occurred. *Bravo v. United States,* 532 F.3d 1154, 1160-61 (11th Cir. 2008). Under Florida law, Earl Jr. is entitled to damages for past and future pain and suffering; loss of capacity for the enjoyment of life; permanent and total disability; loss of capacity to earn money or be gainfully employed in the future; past and future disfigurement and scarring; past and future mental anguish; past economic damages, including medical expenses; and future medical expenses. *See* § 766.202(8); Fla. Std. Jury Instr. 501.2. Plaintiffs Marla Dixon and Earl Reese-Thornton, Sr. are entitled to damages for past and future mental pain and suffering. *See id.*

### A. Statutory Caps for Noneconomic Damages

Dixon was a Medicaid recipient at the time of Earl Jr.'s birth. Florida Statute § 766.118(6) places a cap on noneconomic damages in medical malpractice cases involving a Medicaid recipient. The cap is $300,000 per claimant, "unless the claimant pleads and proves, by clear and convincing evidence, that the practitioner acted in a wrongful manner." *Id.* The statute defines "wrongful manner" as "bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property." Fla. Stat. § 766.118(6)(c). Plaintiffs failed to present clear and convincing evidence that Dr. Atogho acted in a wrongful manner, willfully disregarding the safety of Earl Jr.

Florida Statute § 766.118, as a whole, provides statutory caps for noneconomic damages in wrongful death and personal injury medical malpractice cases. In *Estate of McCall v. United States*, 134 So. 3d 894, 901, 905 (Fla. 2014), the Florida Supreme Court found that the statutory cap on noneconomic damages in wrongful death cases violated the Florida Constitution's Equal Protection Clause, in part because "the cap on noneconomic damages. . . bears no rational relationship to a legitimate state objective, thereby failing the rational basis test." (internal citations omitted). The plurality's analysis of the statute under the rational basis test analyzed the legislature's intent in passing § 766.118 as a whole, not just the cap on damages in wrongful death cases. *Id.* at 905-15. Indeed, the plurality concluded that "no rational basis currently exists (if it ever existed) between the cap imposed by section 766.118 and any legitimate state purpose. . .At the present time, the cap on noneconomic damages serves no purpose other than to arbitrarily punish the most grievously injured or their surviving family members." *Id.* at 914-15.

Following *McCall*, at least two district courts of appeal have found the statutory caps for noneconomic in § 766.118 unconstitutional in personal injury medical malpractice cases. *See Port Charlotte HMA, LLC v. Suarez*, No. 2D15–3434, 2016 WL 6246703, at *2–3 (Fla. 2d Dist. Ct. App. Oct. 26, 2016) (holding the statutory cap for noneconomic damages in § 766.118(3), which applies to causes of action for personal injury or wrongful death arising from medical negligence, unconstitutional under the reasoning of *McCall*); *N. Broward Hosp. Dist. v. Kalitan,* 174 So.3d 403, 410-11 (Fla. 4th Dist. Ct. App. 2015). In 2015, Florida's Fourth District Court of Appeal, in *North Broward Hospital District v. Kalitan*, 174 So. 3d 403 (Fla. Dist. Ct. App. 2015),[2] held that

---

[2] *Review pending*, No. SC15-1858 (Fla. 2015). The case has been fully briefed in the Florida Supreme Court and was argued on June 9, 2016.

*McCall* mandated a finding that section 766.118's caps on noneconomic damages in personal injury cases were similarly unconstitutional:

> [A]dhering to *McCall*, the section 766.118 caps are unconstitutional not only in wrongful death actions, but also in personal injury suits as they violate equal protection. It makes no difference that the caps apply horizontally to multiple claimants in a wrongful death case (as in *McCall*) or vertically to a single claimant in a personal injury case who suffers noneconomic damages in excess of the caps (as is the case here). Whereas the caps on noneconomic damages in section 766.118 fully compensate those individuals with noneconomic damages in an amount that falls below the caps, injured parties with noneconomic damages in excess of the caps are not fully compensated.

*Id.* at 411. *See also Port Charlotte HMA, LLC v. Suarez*, No. 2D15-3434, 2016 WL 6246703 (Fla. Dist. Ct. App. Oct. 26, 2016).

Therefore, although no Florida court has directly addressed the cap for Medicaid recipients under § 766.118(6), Florida courts have broadly applied *McCall* to hold that the statutory caps in § 766.118 are unconstitutional with respect to personal injury actions. The Court concludes that *McCall* and its progeny apply equally to subsection 6 (although not expressly directed to that subsection) because it, like subsections 1, 2 and 3, limits damages "arbitrarily [which] diminishes compensation for legally cognizable claims," *McCall*, 134 So. 3d at 901, and denies plaintiffs equal protection. For the same reasons already set forth in *McCall* and its progeny, the Court determines that Florida courts would hold this subsection unconstitutional as well. Therefore, the statutory caps do not apply.

### B. Reasonableness of the Damages Award

"Under Florida law, an award of non-economic damages must bear a reasonable relation to the philosophy and general trend of prior decisions in such cases." *Bravo*, 532 F.3d at 1162 (internal citations omitted). In order to determine the philosophy and trend of prior decisions, the Eleventh Circuit has stated that courts must look to judgments that have been upheld on appeal by the Florida appellate court that would have had jurisdiction over an appeal in the case had it been filed in state court. *Id.* at 1164. Here, the Third District Court of Appeal would have jurisdiction if this case had been filed in state court. *Id.* However, there are very few appellate decisions analyzing awards of

non-economic damages in similar cases in Florida, presumably because the statutory caps in section 766.118 were only recently held unconstitutional. The parties have not cited, and the Court has not been able to find, any decisions in similar cases from the Third District Court of Appeal.

The only recent decision in a similar case from any Florida appellate court that the Court has been able to find is *Port Charlotte HMA, LLC v. Suarez*, in which the Second District Court of Appeal of Florida upheld a jury verdict that awarded $1,250,000 in noneconomic damages to a child that suffered brain damage due to the negligence of doctors during the mother's labor and delivery. 2016 WL 6246703 at *1. The court also upheld the jury's award of $4,000,000 in noneconomic damages to the child's mother. *Id.* The court noted that the child would need 24-hour care for the rest of her life. *Id.* However, the court's decision primarily analyzed whether the statutory caps in section 766.118 were constitutional and whether the trial court should have applied an economic setoff pursuant to section 768.81, and did not provide any analysis of the actual amount of the jury's award of noneconomic damages. *Id.*

Given the limited number of recent similar decisions in Florida, the Court also looked to appellate decisions from outside of Florida in determining whether its award of non-economic damages bears a reasonable relationship to the philosophy and general trend of prior decisions in similar cases. However, there appear to be few appellate decisions in similar cases from outside Florida that do not involve statutory caps. In the most recent similar appellate decision that the Court found, the Michigan Court of Appeals upheld a jury verdict that awarded $2.5 million in past noneconomic damages and $11,189,000 in future noneconomic damages to the plaintiffs for severe brain damage suffered by a baby at birth. *Vanslembrouck ex rel. Braverman v. Halperin*, No. 309680, 2014 WL 5462596, at *1 (Mich. Ct. App. Oct. 28, 2014). The plaintiff's experts opined that the baby's injuries were consistent with hypoxic ischemic encephalopathy and were caused by the doctor's negligence during the delivery and birth, including the doctor's failure to timely stop administering Pitocin and the failure to timely perform a C-section. *Id.* at *29. The child was 18 years old at the time of the trial and could not walk, talk, or feed herself. *Id.* at *1. She required full-time care. *Id.* The jury calculated the damages based on a life expectancy of age 82, and calculated the future noneconomic damages at a rate of $167,000 per year. *Id.* at *55 n. 28, *61. The court did not perform an in-depth analysis of the amount of the award of non-economic damages.

In support of their request for noneconomic damages, the Plaintiffs have cited to two federal district court decisions in FTCA cases involving similar facts. The Defendant objects to the Court's consideration of these two decisions because they did not apply Florida law and have not been appealed on grounds

that the awards were excessive. However, given the lack of appellate decisions in similar cases both within and outside of Florida, the Court has considered both cases. In the first case, which involved a hypoxic ischemic brain injury suffered by a child at birth, the court awarded the child $5 million for loss of a normal life, $3 million for pain and suffering, $2 million for disfigurement, and $1 million for risk of future harm, for a total of $11 million in noneconomic damages. *CSC v. United States*, No. 10-910, 2013 WL 6795723, at *16-17 (S.D. Ill. Dec. 20, 2013). In determining the amount of noneconomic damages, the court noted that the child would never live independently, would forever be incontinent, would never be able to have a conversation with his parents, would require constant supervision, and had severe disfigurement. *Id.*

In the second case, which involved permanent brain damage suffered by a baby due to a doctor's negligence during the mother's labor and delivery, the court awarded the plaintiff $9.1 million in noneconomic damages. *Arroyo v. United States*, No. 07 C 4912, 2010 WL 1437925, at *1, *16 (N.D. Ill. April 2, 2010). The court noted that the baby suffered from permanent pain, entitling him to $2.1 million for past and future pain and suffering. *Id.* The court noted that the baby's injuries were severe and permanent, and that the baby would always require a feeding tube, would need assistance going to the bathroom, would potentially never talk, and would likely never walk. *Id.* The court therefore awarded $5 million for loss of a normal life. *Id.* The court noted that the baby has a small head, feeding tube, muscle tightness, and spastic quadriplegia, and therefore awarded $2 million for disfigurement. *Id.*

All four of the above-referenced cases involved injuries similar to those sustained by Earl Jr. The Court's award to Earl Jr. is more than the amount awarded to the child in *Port Charlotte*, but the Court's award to Dixon is less than the amount awarded to the mother in *Port Charlotte*. The Court's award is very similar to those in *Vanslembrouck*[3]*, CSC, and Arroyo.* Therefore, the Court's award of non-economic damages to the Plaintiffs bears a reasonable relationship to the philosophy and general trend of these recent cases.

The Defendant argues that the Plaintiffs have presented no expert testimony to support a finding that Earl Jr. has "the cognitive ability to appreciate pain, loss of enjoyment of life, inconvenience, physical impairment or diability," and that therefore an award of non-economic damages to Earl Jr. is not supported by the evidence. (Def.'s Mem. on Damages at 3-4, ECF No. 151.) The only case that the Defendant has provided in support of its position

---

[3] Although the life expectancy used by the jury in *Vanslembrouck* was greater than the life expectancy that the Court used in this case, it appears that the plaintiffs in *Vanslembrouck* sought, and that the jury awarded, noneconomic damages only to the child. Here, the Court's award of noneconomic damages includes noneconomic damages suffered by Earl Jr.'s parents.

is a case decided in 1954 by the Florida Supreme Court. In that case, a five-year old boy sustained injuries in a car crash and died "some months later." *Hooper Const. Co. v. Drake*, 73 So.2d 279, 280 (Fla. 1954). The court upheld an award of damages to the child's father in the amount of $35,000, but held that the evidence was not sufficient to support damages in the amount of $20,000 for the child's pain and suffering because the child was either unconscious or in a semi-comatose condition for the entire time after the car accident. *Id.* at 280-81. In more recent decisions, Florida courts have specifically held that "awards of zero damages for future noneconomic damages are unreasonable when there is undisputed evidence of permanent injury and a need for treatment in the future." *See, e.g.*, *Ellender v. Bricker*, 967 So.2d 1088, 1093-94 (Fla. Dist. Ct. App. 2007) (citations omitted). Recent appellate cases in Florida have noted that damages for pain and suffering "are difficult to calculate, have no set standard of measurement, and for this reason are uniquely reserved to a jury for their discretion." *Ortega v. Belony*, 185 So.3d 538, 539-40 (Fla. 3d Dist. Ct. App. 2015) (further noting that "[w]hen attempting to quantify a damage award for pain and suffering in a personal injury case, the trier of fact deals with the most intangible element of the award."). Indeed, in *Port Charlotte HMA, LLC v. Suarez*, the court noted that the plaintiff "has severe neurological impairments that render her physically unable to do basic things; she will be fully dependent on others for the rest of her life and will need 24-hour care," yet the court ultimately upheld the jury's award of noneconomic damages. 2016 WL 6246703 at *1; *see also Nimnicht v. Ostertag*, 225 So.2d 459, 461 (Fla. 1st Dist. Ct. App. 1969) (upholding jury's award of damages for pain and suffering to deceased woman who was either unconscious or semi-conscious during the 23 hours that she lived following a car crash)

Although one Florida appellate court has noted that if a plaintiff presents "no proof of physical injury or emotional pain and suffering, courts have been reluctant to uphold damages awards that exceed six figures," *Ernie Haire Ford, Inc. v. Atkinson*, 64 So.3d 131, 132 (Fla. 2d. Dist. Ct. App. 2011), here there has been extensive testimony about the extent of Earl Jr.'s severe physical ailments. Dixon and Reese-Thornton, Sr. testified that Earl Jr. cried constantly when they brought him home from the hospital. Although the Defendant is correct that Dr. Tomasovic testified that Earl Jr. is in a near persistent vegetative state, no expert testified that Earl Jr. is unable to feel pain. Therefore, the Court finds the Defendant's argument unpersuasive.

The Court similarly rejects the Defendant's argument that Dixon and Reese-Thornton, Sr. are not entitled to noneconomic damages because they have not been "supporting and loving parents." (Def.'s Mem. of Damages at 4, ECF No. 151.) As stated above, the Court finds that Dixon and Reese-Thornton,

Sr. are supporting and loving parents, and that their actions are indicative of their pain and suffering. Furthermore, the Defendant has not presented any case law requiring that parents be unfailingly supportive in order to recover noneconomic damages.

### C. *Distribution of Future Economic Damages*

The final issue with respect to damages is the manner of distribution of the future economic damages. "The FTCA authorizes courts to craft remedies that approximate the results contemplated by state statutes." *See, e.g., Dutra v. U.S.*, 478 F.3d 1090, 1092 (9th Cir. 2007); *Cibula v. U.S.*, 664 F.3d 428, 433 (4th Cir. 2012). Florida Statute § 768.78 provides alternative methods for payment of damages awards. Pursuant to § 768.78(2)(a), in any action for damages based on personal injury or death arising out of medical malpractice, the payment of future economic losses may be made by: (1) a lump-sum payment for all damages, with future economic losses and expenses reduced to present value; or (2) at the request of either party, future economic damages may be paid by periodic payments. If a party elects to make periodic payments, the amount of the payments "shall equal the dollar amount of all future damages before any reduction to present value." Fla. Stat. § 768.78(2)(b)(1). The defendant shall be required to post a bond or security or otherwise to assure full payment of the damages awarded. Fla. Stat. § 768.78(2)(b)(2).

The Defendant has requested to make periodic payments. (*See, e.g.*, Notice, ECF No. 139.) However, at the hearing held on March 29, 2017 concerning the Defendant's request, the Government acknowledged that it cannot be subjected to ongoing obligations. *See Lee v. U.S.*, 765 F.3d 521, 528 (5th Cir. 2014); *Hull by Hull v. U.S.*, 971 F.2d 1499, 1504 (10th Cir. 1992) (noting that some courts have interpreted the FTCA to require a lump sum money judgment); *Cibula*, 644 F.3d at 433. Therefore, the Defendant has requested to pay the entire amount of future economic damages, not reduced to present money value, into the Court Registry, to be distributed on a periodic basis. (Def.'s Response to Court's Order, ECF No. 183.) In addition, the Defendant asserted at the hearing that in the event that Earl Jr. passes away prior to the end of the life expectancy determined by the Court, any remaining funds in the Court Registry should revert back to the Government.

Some circuits have held that district courts in an FTCA action can order a reversionary trust if such an arrangement is in the child's best interest, or if the parents or guardians of the child consent to such an arrangement. *See, e.g., Hull by Hull*, 971 F.2d at 1505 (holding that the district court had the inherent authority to order a reversionary trust in an FTCA action if it determined that it was in the child's best interest, and noting that the fact that

the child's legal representative had consented to the trust was "highly relevant"); *Cibula*, 664 F.3d at 433-36 (holding that the district court had authority in an FTCA case to order a reversionary trust and noting that both parties had urged the district court to fashion a reversionary trust). However, some district courts have declined to impose reversionary trusts when such trusts are not provided for by state law and where the plaintiff does not consent to the reversionary trust. *See, e.g.*, *Peterson v. U.S.*, 469 F.Supp.2d 857, 860 (D. Haw. 2007) (declining to impose a reversionary trust because "not imposing a reversionary trust comports with the principles of fairness in allocating the risks between the parties."); *Davidson v. United States Dep't of Health and Human Serv's*, No. 7:06-129-DCR, 2007 WL 3231713, at *2 (E.D. Ky. Oct. 30, 2007) (declining to impose reversionary trust where the plaintiff did not consent, no evidence was submitted that such a trust was necessary for the plaintiff's protection, and state law did not provide for a reversionary trust).

Here, the Plaintiffs have not consented to a reversionary trust. Furthermore, Florida Statute § 768.78 does not expressly authorize a reversionary trust. Florida Statute § 768.78 has two subsections. The first subsection generally applies to any action in which the trier of fact awards future economic losses in excess of $250,000. Fla. Stat. § 768.78(1)(a). In such cases, the defendant may elect to pay the future economic losses by periodic payments. *Id.* The first subsection specifically states: "if the claimant dies prior to the termination of the period of years during which periodic payments are to be made, the remaining liability of the defendant, reduced to present value, shall be paid into the estate of the claimant in a lump sum." Fla. Stat. § 768.78(1)(b).

The second subsection of § 768.78 applies to actions "for damages based on personal injury or wrongful death arising out of medical malpractice," and also provides for the payment of future economic damages by periodic payments. Fla. Stat. § 768.78(2). However, the second subsection does not include the provision set forth in the first subsection stating that in the event that the claimant dies, any remaining liability shall be paid into the estate of the claimant. *See id.* Rather, the second subsection is silent on what shall happen to any remaining liability if the claimant dies prior to the termination of the period of years during which periodic payments are to be made. The Government argues that this silence means that any remaining funds should revert back to it in the event of Earl Jr.'s death.

The Plaintiffs disagree, arguing that the second subsection does not include other provisions from the first subsection that were clearly intended to apply to medical malpractice actions. For example, the second subsection does

not include the provision set forth in the first subsection that attorney's fees shall be based on the total judgment and shall be paid from past and future damages in the same proportion. *See* Fla. Stat. §§ 768.78(1)(f) and 768.78(2). The Plaintiffs assert that the absence of this provision in the second subsection cannot mean that the Florida legislature intended that attorney's fees in medical malpractice actions be paid differently. Similarly, the Plaintiffs assert that the absence of a provision concerning the payment of any remaining liability in the event of the death of the claimant does not mean that the Florida legislature intended that any remaining future economic damages revert back to the defendant.

No Florida court has addressed this issue, and the Court notes that it does not appear that Florida courts typically impose reversionary trusts in medical malpractice cases. Thus, since the statute does not specifically provide for a reversionary trust and it is not a remedy routinely provided by Florida courts, the Court does not find that imposing such a trust is necessary in order to approximate state law. Since the Government has presented no argument that a reversionary trust would be in Earl Jr.'s best interest and the Plaintiffs have not consented to a reversionary trust, the Court declines to impose one.

The Court will, however, allow the Government to make periodic payments towards its obligations to pay future economic damages. The Government has offered to pay all future economic damages, not reduced to present value, into the Court's registry to be held in the registry of the Court pursuant to Fed. R. Civ. P. 67. But the core purpose of Rule 67 is "to relieve a party who holds a contested fund from responsibility for disbursement of that fund among those claiming some entitlement [to it]." *Zelaya/Capital Int'l Judgment, LLC v. Zelaya,* 769 F.3d 1296, 1302 (11th Cir. 2014). *Accord Klayman v. Judicial Watch, Inc.,* 650 F. App'x 741, 743 (11th Cir. May 27, 2016 (purpose of Rule 67 is to relieve the depositor of responsibility for a fund in dispute, such as in an interpleader action). The Government wants the money to be held by the Court so that if it prevails on appeal on one or more of the issues it will raise on appeal (the cap on damages; the reasonableness of the amount of damages; or the reversionary trust) it wants the money to be preserved to be returned to the Government. But, ordering the money to be placed in a non-special needs trust with a qualified trustee can accomplish the same goal. And, because the Government has agreed to deposit all of the funds, not reduced to present value, there is no need for the Government to post a bond for the periodic payments.

The next issue relating to the periodic payments is the frequency of those payments. The Government has argued that payments should be made to the Plaintiff Earl Jr. on a yearly basis. The Court has considered all the evidence in

the case, including the testimony of the Defendant's life expectancy expert who has opined that Earl Jr. has a life expectancy of an additional 9 to 12 years. He also opined that there is a 50% chance that Earl Jr. could live less than 9 to 12 years. With those estimates in mind, the Court orders that the periodic payments should be made to the Plaintiff Earl Jr. as follows:

> First payment to be paid immediately: cost of the first 5 years
> Second payment to be paid in five years: cost of the next 4 years
> Third payment to be paid in nine years: cost of the next 3 years
> Fourth and all subsequent payments: cost of 1 year to be paid each year

## 5. Conclusion

The Court awards Plaintiff Earl Jr. the following damages:

| | |
|---|---|
| Past and future economic damages: | $21,788,495.91 |
| Past and future non-economic damages: | $7,625,000 |
| **Total damages for Earl Jr.** | **$29,413,495.91** |

The Court awards Plaintiff Marla Dixon the following damages:

| | |
|---|---|
| Past non-economic damages: | $300,000 |
| Future non-economic damages: | $3,000,000 |
| **Total damages for Marla Dixon:** | **$3,300,000** |

The Court awards Plaintiff Earl Reese Thornton the following damages:

| | |
|---|---|
| Past non-economic damages: | $100,000 |
| Future non-economic damages: | $1,000,000 |
| **Total damages for Earl Reese Thornton:** | **$1,100,000** |

| | |
|---|---|
| **Total damages to Plaintiffs:** | **$33,813,495.91** |

The future economic damages shall be paid on a periodic basis as set forth *infra*. All other damages shall be payable immediately.

100% of Plaintiff Earl Jr.s' attorneys' fees and costs shall be payable immediately but shall be paid from Earl Jr.'s non-economic damages so that all of the monies paid for his economic damages will be available to pay for all of his living and medical expenses.

The Plaintiffs shall prepare a proposed Final Judgment consistent with this Order and Verdict within 5 days and submit to the Defendants for their

review before submitting to the Court. The proposed Final Judgment shall be submitted to the Court within 10 days. If the parties cannot agree on the form of the Final Judgment, each may submit its own proposed Final Judgment within 10 days.

**Done and ordered**, at Miami, Florida, on April 28, 2017 nunc pro tunc to April 17, 2017.

Robert N. Scola, Jr.
United States District Judge